

**University of Baltimore Law**
**ScholarWorks@University of Baltimore School of Law**

All Faculty Scholarship                                    Faculty Scholarship

2019

# The Harm of Child Removal

Shanta Trivedi
*University of Baltimore School of Law,* strivedi@ubalt.edu

Follow this and additional works at: https://scholarworks.law.ubalt.edu/all_fac

Ｃ Part of the Family Law Commons

Recommended Citation

Shanta Trivedi, *The Harm of Child Removal*, 43 New York University Review of Law & Social Change 523 (2019).
Available at: https://scholarworks.law.ubalt.edu/all_fac/1085

This Article is brought to you for free and open access by the Faculty Scholarship at ScholarWorks@University of Baltimore School of Law. It has been accepted for inclusion in All Faculty Scholarship by an authorized administrator of ScholarWorks@University of Baltimore School of Law. For more information, please contact hmorrell@ubalt.edu.

# THE HARM OF CHILD REMOVAL

SHANTA TRIVEDI [∞]

## ABSTRACT

*When the state proves or even merely alleges that a parent has abused or neglected a child, a court may remove the child from the parent's care. However, research shows separating a child from her parent(s) has detrimental, long-term emotional and psychological consequences that may be worse than leaving the child at home. This is due to the trauma of removal itself, as well as the unstable nature of, and high rates of abuse in, foster care. Nevertheless, the child welfare system errs on the side of removal and almost uniformly fails to consider the harms associated with that removal. Only two jurisdictions require courts to consider the harms that will occur when a child is taken from her family. And while recent federal law recognizes the importance of family preservation and the negative effects of separation, it does not solve the problem by itself. This article is the first to comprehensively examine why the harm of removal should be a featured part of every child welfare decision. After doing so, it continues to analyze existing law and legal practices to demonstrate how consideration of the harms of removal can be built into existing legal frameworks to achieve the stated purpose of the child welfare system and truly protect our children.*

[∞] Shanta Trivedi is a Clinical Teaching Fellow in the University of Baltimore Bronfein Family Law Clinic. This article is dedicated to the extraordinary attorneys of the Brooklyn Defender Services Family Defense Practice, particularly Lauren Shapiro and Lynn Vogelstein, who first introduced me to the harms inflicted by the child welfare system and taught me how to fight against them. I am forever indebted to the faculty at the University of Baltimore School of Law's Clinical Law Program for their tremendous support and inspiration, especially Margaret E. Johnson for her thoughtful and exceptional guidance throughout this process and Michele E. Gilman for her insight and advice. Thank you also to Ann Shalleck and my colleagues at the NYU Clinical Writers' Workshop for their helpful feedback at the early stages of the writing process, and my peers at the Association of American Law Schools Conference on Clinical Legal Education Works in Progress Workshop for their contributions at the end. To Matthew I. Fraidin, thank you for giving me the idea to explore this topic that is so important to me. Thank you to Marty Guggenheim for taking the time to review this article. Also, huge thanks to Tarek Ismail, for generously sharing your statutory research and to Samuel Draper, Brett Smoot, and especially Katherine Haladay for their tremendous research support. To my N.Y.U. Review of Law & Social Change editorial team, Cody Cutting, Joanna R. Loomis, and Molly Griffard—you are all wise beyond your years. To my parents and Nirad & Cheryle, thank you for your lifelong support. And finally, to Somil, Dylan, and Serena, thank you for your unconditional love and patience (and excellent in-house editing).

I. INTRODUCTION ....................................................................................................525
II. WHAT IS THE HARM OF REMOVAL? ............................................................527
   A. Emotional and Psychological Harms ................................................527
     1. Separation and Attachment Disorders ......................................528
     2. Trauma Inherent in the Act of Removal ..................................531
     3. Grief and Confusion Due to Separation from One's Family.......532
     4. Unique Harms for Minority Children .......................................534
   B. Harms of Foster Care ...........................................................................541
     1. Abuse and Neglect in Foster Care ............................................542
     2. Foster Care Placement Instability.............................................544
     3. Physical and Sexual Health Problems .....................................546
     4. Mental Health Effects and Consequences of Foster Care Placement.....549
     5. Long-Term Outcomes for Foster Children ..............................550
III. HOW THE LAW CONTRIBUTES TO HARM .....................................................552
   A. The First Child Removals ....................................................................552
   B. The States' Legal Interests in Protecting Children .....................555
   C. Federal Intervention.............................................................................557
   D. How Removals Are Conducted Without Consideration of Harm of
     Removal................................................................................................560
   E. Reasonable Efforts Statutes That Do Not Incorporate the Harm of Removal
     .................................................................................................................562
IV. HOW THE LAW CAN HELP CHILDREN.............................................................563
   A. The Right to Family Integrity.............................................................563
   B. New Federal Law..................................................................................565
   C. Helpful State Statutes Regarding Reasonable Efforts to Prevent Removal
     .................................................................................................................566
   D. Jurisdictions That Get It Right ..........................................................567
     1. The District of Columbia ............................................................568
     2. New York ......................................................................................569
V. RECOMMENDATIONS .........................................................................................571
   A. Federal Consideration of Harm of Removal ..................................572
   B. State Consideration of Harm of Removal.......................................573
   C. Judicial Decision-Making....................................................................576
   D. Lawyers' Advocacy..............................................................................577
VI. CONCLUSION .....................................................................................................579

## I.
## INTRODUCTION

In a recent case in New York, a mother came under investigation when she took her then six-week-old son, Kaden, to the hospital with head injuries.[1] New York City's Administration for Children's Services ("ACS") became involved after a doctor at the hospital concluded that Kaden's injuries were inconsistent with his mother's explanation.[2] Kaden was removed from his mother's care, as was his nine-year-old sister Rihana.[3] Since the children had different fathers, the siblings were also initially separated from each other.[4] Rihana was placed in the care of her father—with whom she had previously only experienced weekend visitation.[5]

Following the separation from her mother and brother, Rihana's emotional state deteriorated. She started having problems in school and even threatened to harm herself if not returned to her home.[6] Her therapist observed that she had "regressed to where she had been two years prior."[7] Although she showed some improvement after being moved from her father's home to her grandmother's, Rihana, through her attorney, kept begging to come home to her mother.[8] In an in camera interview, "Rihana expressed to the Court her desire to return home to her mother and that she is sad to be away from her."[9] For Rihana, the harm of removal was extremely high.

Recent uproar about the separation of immigrant children from their parents at our southern border has led to an outpouring of information from the medical community about the horrifying effects that family separation has on children.[10] Doctors say family separation yields "catastrophic" results, with the trauma of being taken from one's parents having long-term effects on children's brains.[11] Over 13,000 mental health professionals signed a petition which states that "[t]o pretend

---

1. In re Rihana J.H., No. NA-XXXX-16, 2017 WL 890526, at *1 (N.Y. Fam. Ct. Feb. 23, 2017).

2. *Id.*

3. *Id.*

4. *See id.* at *1–2.

5. *Id.* at *1.

6. *Id.*

7. *Id.* at *5.

8. *See id.* at *3–5.

9. *Id.* at *3.

10. *See, e.g.*, Press Release, Colleen Kraft, Am. Acad. of Pediatrics, AAP Statement Opposing Separation of Children and Parents at the Border (May 8, 2018) [hereinafter Kraft], https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/StatementOpposingSeparationof ChildrenandParents.aspx [https://perma.cc/25QX-B2ZA]; *see also* William Wan, *What Separation from Parents Does to Children: 'The Effect Is Catastrophic,'* WASH. POST (June 18, 2018), https://www.washingtonpost.com/national/health-science/what-separation-from-parents-does-to-children-the-effect-is-catastrophic/2018/06/18/c00c30ec-732c-11e8-805c-4b67019fcfe4_story .html?noredirect=on&utm_term=.28fb9b1e08f8 [https://perma.cc/7N85-CLEP].

11. Wan, *supra* note 10.

that separated children do not grow up with the shrapnel of this traumatic experience embedded in their minds is to disregard everything we know about child development, the brain, and trauma."[12] The American Association of Pediatrics noted that family separation "can cause irreparable harm, disrupting a child's brain architecture and affecting his or her short- and long-term health. This type of prolonged exposure to serious stress—known as toxic stress—can carry lifelong consequences for children."[13]

This information, while disturbing, is not new. Study after study demonstrates that children also suffer complex and long-lasting harms when they are removed from their parents and placed into foster care. Yet, in most states, courts consider only whether a child is at risk of harm if she remains in her parents' care, without factoring in the harm that results from the alternative—removing that child from her home and her family. Due to the child welfare system's long history of erring on the side of removal, taking children from their parents is widely considered the better and safer course of action. There are certainly cases in which removal may be necessary. But in two jurisdictions, courts are required to consider the whole picture, including the harm of removal, before coming to that conclusion. Further, recent federal law demonstrates recognition of the dangers of taking children from their families and may signal a broader shift back towards prioritizing family preservation.

This article explores how the child welfare system's stated goal of protecting children would be better served if all involved parties utilized information about the harm of removal when making decisions. This includes passing legislation; allocating funding; considering removals; and lawyers advocating for clients in an effort to keep their families together. This paper argues that consideration of the harm of removal would allow the child welfare system to better serve children by contemplating all potential harms prior to removal and balancing them to determine what is really in a particular child's best interest—removal or remaining at home.

Part II highlights some of the many harms that result from child removal. These include emotional, societal, and cultural detachment, as well as the myriad negative outcomes flowing from placement into a broken foster care system.

Part III identifies how our culture and laws have contributed and continue to contribute to the harm suffered by children by disregarding the adverse consequences of removal.

Part IV demonstrates areas where existing law protects children by recognizing the right to family integrity and requiring consideration of the harms of child removal.

---

12. *Petition from Mental Health Professionals: Stop Border Separation of Children from Parents!*, CHILD'S WORLD AM., https://childsworldamerica.org/stop-border-separation/stop-border-separation-text-preview/ [https://perma.cc/38TA-6NHS] (last updated June 22, 2018, 9:40 AM).

13. Kraft, *supra* note 10.

Part V makes recommendations for improvements to the current system as applied to the harms of child removal. First, Congress could increase the amount of funding available to protect children. Second, state legislatures could mandate that the harm of removal be considered by judges and the state. Third, judges could construe existing law to require consideration of the harm of removal in abuse and neglect proceedings. Fourth, lawyers in family court proceedings can raise facts about the harm of removal, providing judges with the information necessary to assess whether the harm of removal from parents outweighs the harm of staying with them.

## II.
## WHAT IS THE HARM OF REMOVAL?

The "harm of removal" is a blanket term used in the child welfare system for the multiple ways a child may be negatively impacted by separation from her family and placement into foster care.[14] It conveys a recognition that "[r]emoval and placement in foster care may have a worse impact on the child than neglect."[15] Notably, while the term is phrased in the singular—"harm"—there is no single "harm" of removal, but rather numerous independent and overlapping "harms." Hence, this Part discusses some, though certainly not all, of the harms that arise when a child is removed from the care of her parents due to proven or suspected abuse or neglect.

While the accepted wisdom is that removal is the better option for a child in a potentially abusive or neglectful home, research demonstrates that this is not always true. In fact, the bond between children and their parents is extremely strong and disrupting it can be even more damaging to a child—even when her parents are imperfect.

### *A. Emotional and Psychological Harms*

The child welfare system frequently underestimates and undervalues the negative impact on a child who is removed from her family.[16] Substantial evidence

---

14. *See, e.g., Removals from Parents and Caretakers in Child Welfare Cases, Oversight Hearing Before the Comms. on Justice Sys. & Gen. Welfare* 4–5 (N.Y.C. 2018) (statement of Lauren Shapiro, Director, Family Defense Practice, Brooklyn Defender Services), http://bds.org/wp-content/uploads/BDS-City-Council-Testimony-on-Family-Separation-Final-1.pdf [https://perma.cc/BN46-69RF]; Theo Liebmann, *What's Missing from Foster Care Reform? The Need for Comprehensive, Realistic, and Compassionate Removal Standards*, 28 HAMLINE J. PUB. L. & POL'Y 141, 155, 175 n.126 (2006); Jane Spinak, *When Did Lawyers for Children Stop Reading Goldstein, Freud and Solnit? Lessons from the Twentieth Century on Best Interests and the Role of the Child Advocate*, 41 FAM. L.Q. 393, 407 (2007); Richard Wexler, *Take the Child and Run: How ASFA and the Mentality Behind It Harm Children*, 13 U.D.C. L. REV. 435, 444 (2010).

15. Rebecca Bonagura, *Redefining the Baseline: Reasonable Efforts, Family Preservation, and Parenting Foster Children in New York*, 18 COLUM. J. GENDER & L. 175, 196 (2008).

16. *See* Douglas F. Goldsmith, David Oppenheim, & Janine Wanlass, *Separation and Reunification: Using Attachment Theory and Research to Inform Decisions Affecting the Placements of Children in Foster Care*, 55 JUV. & FAM. CT. J. 1, 6 (2004).

supports the notion that children suffer considerable trauma when they are sepa-
rated from their parents.[17] Indeed, studies show—and some courts have agreed—
that the damage caused by removal from one's parent "may be 'more damaging to
the child than doing nothing at all.'"[18] The problem is that the majority of courts
in America are not required to consider that possibility when determining whether
to remove a child from her parents.[19]

### 1. Separation and Attachment Disorders

The concept that separating children from their families has adverse develop-
mental and biological consequences is hardly new.[20] As early as the 1940s, studies
exposed negative effects on children separated from their parents.[21] "Attachment
theory" suggests that emotional distress and later problems such as aggression and
depression can be attributed to early childhood disruption of the parent-child
bonding process.[22] One of the earliest studies in this area found that foster children
placed in institutional settings showed high rates of "hostile aggressiveness,"
"temper tantrums," "enuresis [bedwetting]," "speech defects," "attention demand-
ing behavior," "shyness and sensitiveness," "difficulties about food," "stubborn-
ness and negativism," "selfishness," "finger sucking," and "excessive crying."[23]

Due to their psychological attachments, children may long to return to their
biological families after being placed with a foster family, even when their bio-
logical families previously mistreated them,[24] and they may benefit from main-
taining familial connections.[25] Psychologists warn that "[p]rofessionals seem to
ignore that for the child, the maltreating parents are the only parents he or she has,
and that any separation, particularly if long and abrupt, will evoke strong and pain-
ful emotional reactions."[26]

In one study, a child participant stated that he did not like his foster parent
simply because "it wasn't my mama, my real mama."[27] Another child exclaimed,

---

17. *See, e.g.*, Lynn F. Beller, *When in Doubt, Take Them out: Removal of Children from Vic-
tims of Domestic Violence Ten Years After* Nicholson v. Williams, 22 DUKE J. GENDER L. & POL'Y
205, 216 (2015).

18. *Id.* (quoting Nicholson v. Williams, 203 F. Supp. 2d 153, 204 (E.D.N.Y. 2002)).

19. *See* discussion *infra* Section III.D.

20. Delilah Bruskas & Dale H. Tessin, *Adverse Childhood Experiences and Psychosocial
Well-Being of Women Who Were in Foster Care as Children*, 17 PERMANENTE J. 131, 138 (2013).

21. *See, e.g.*, Lawson G. Lowrey, *Personality Distortion and Early Institutional Care*, 10 AM.
J. ORTHOPSYCHIATRY 576, 585 (1940); *see also* Frank C. P. van der Horst & René van der Veer,
*Loneliness in Infancy: Harry Harlow, John Bowlby and Issues of Separation*, 42 INTEGRATIVE
PSYCHOL. & BEHAV. SCI. 325, 326–27 (2008).

22. Miriam R. Spinner, *Maternal-Infant Bonding*, 24 CANADIAN FAM. PHYSICIAN 1151, 1151
(1978).

23. Lowrey, *supra* note 21, at 579.

24. *See* Goldsmith, Oppenheim, & Wanless, *supra* note 16, at 1–2.

25. *See* Susan L. Brooks, *The Case for Adoption Alternatives*, 39 FAM. CT. REV. 43, 47 (2001).

26. Goldsmith, Oppenheim, & Wanless, *supra* note 16, at 6.

27. Jason B. Whiting & Robert E. Lee III, *Voices from the System: A Qualitative Study of
Foster Children's Stories*, 52 FAM. REL. 288, 292 (2003).

"[F]oster care is just sick! . . . You get taken away from your parents. It ruins your life! Your heart is totally destroyed, and the only thing that is left working in your body is your brain. . . . That is why I want out of this foster care right now."[28] These statements evidence the heart-wrenching effects of separation.

Newborns are often removed by child protective agencies[29] without regard for the fact that they suffer significant negative effects when taken from their parents, and especially when taken from their mothers.[30] Studies show that newborns prefer the sound of their mothers' voice over those of other females, which doctors see as evidence that the period after birth is critical for bonding.[31] It is also now widely accepted that skin-to-skin contact between parents and their babies in the first hours of life has significant health benefits for the infant.[32] Physical contact and proximity to their parents is therefore crucial for infants.

The newborn experience is extremely important in the context of the current nationwide opioid crisis. When a newborn tests positive for illegal drugs at birth, or even methadone used in the *treatment* of opioid addiction, the mother may be criminally prosecuted and the child welfare system almost always removes the baby soon after birth.[33] Dr. Ron Abrahams, medical director of perinatal addictions at B.C. Women's Hospital in Vancouver, believes that the symptoms observed in such children after birth, and alleged to be signs of withdrawal justifying removal, are often confused with the stress of separation from the baby's mother.[34]

---

28. *Id.*

29. *See, e.g.,* Bower v. Lawrence Cty. Children & Youth Servs., 964 F. Supp. 2d 475, 478, 481 (W.D. Pa. 2013) (Children and Youth Services took newborn into custody when "[m]other tested positive for opiates at child's birth"); In re Arianna M., No. D066178, 2014 WL 7463151, at *1 (Cal. Ct. App. Dec. 31, 2014) ("[Newborn] was detained at the hospital at her birth by the San Diego County Health and Human Services Agency . . . as a result of her mother's admitted methamphetamine use."); M.L. v. Super. Ct. of Ventura Cty., 90 Cal. Rptr. 3d 920, 926 (Ct. App. 2009) (holding that newborn was properly detained at the hospital where "the newborn was 24 hours old and had been exposed to drugs during gestation. Mother had received little prenatal care and, one year earlier, had exposed another child to drugs during gestation."); In re Welfare of Frederiksen, 610 P.2d 371 (Wash. Ct. App. 1979) (holding that Department of Social and Health Services rightfully performed their duty by removing the child from its mother at birth).

30. *See generally* Kimberly Howard, Anne Martin, Lisa J. Berlin, & Jeanne Brooks-Gunn, *Early Mother-Child Separation, Parenting, and Child Well-Being in Early Head Start Families,* 13 ATTACHMENT & HUM. DEV. 5 (2011)).

31. Anthony J. DeCasper & William P. Fifer, *Of Human Bonding: Newborns Prefer Their Mothers' Voices,* 208 SCI. 1174 (1980).

32. *E.g.,* Jeannette T. Crenshaw, *Healthy Birth Practice #6: Keep Mother and Baby Together—It's Best for Mother, Baby, and Breastfeeding,* 23 J. PERINATAL EDUC. 211 (2014); *see also* Jeanne Pigeon Turenne, Marjolaine Héon, Marilyn Aita, Joanne Faessler, & Chantal Doddridge, *Educational Intervention for an Evidence-Based Nursing Practice of Skin-to-Skin Contact at Birth,* 25 J. PERINATAL EDUC. 116 (2016).

33. Olga Khazan, *Into the Body of Another,* ATLANTIC (May 8, 2015), https://www.theatlantic.com/health/archive/2015/05/into-the-body-of-another/392522/ [https://perma.cc/9AWJ-TT44].

34. Kristin Nelson, Idella Sturino, & Julie Crysler, *Separating Newborn Babies from Mothers with Addiction Does More Harm Than Good, Says Doctor,* CBC RADIO: CURRENT (Mar. 13, 2018), http://www.cbc.ca/radio/thecurrent/the-current-for-march-13-2018-1.4572942/separating-newborn-babies-from-mothers-with-addiction-does-more-harm-than-good-says-doctor-1.4572982 [https://perma.cc/TF2P-S6XA].

Similarly, Dr. Joshua Sharfstein, a pediatrician and professor at the Johns Hopkins Bloomberg School of Public Health, argues that babies who are removed from their mothers based on the mother's drug use during pregnancy actually tend to fare worse, not better.[35] He has cautioned against repeating the mistakes of what he calls the "crack baby panic," when children were removed from their mothers based on positive drug tests, yet suffered no long-term developmental issues related to their mothers' prenatal drug use.[36] Dr. Matthew Grossman, assistant professor of pediatrics and hospitalist at Yale New Haven Hospital, found that babies who were allowed to spend more time with their mothers had shorter periods of withdrawal symptoms than those who were isolated and treated pharmacologically.[37] Hospitals experimenting with "rooming in" programs, whereby babies are allowed to stay with their mothers instead of being placed in the neonatal intensive care unit, have consistently affirmed these findings.[38] Yet the child welfare system remains ignorant to these lessons.

The ongoing immigrant family separation crisis highlights the experience of separation anxiety. Even after being reunited, children who had been forcibly separated from their parents at the border demonstrated anxiety when their parents left the room for brief periods, even to take a bath.[39] One child refuses to go to school for fear of being torn from his mother again, and another will only sleep if she is safe in her mother's arms.[40] Thus, evidence of separation anxiety and attachment disorders in the context of family separation at the border provides a

35.  Robert Siegel & Joshua Sharfstein, *For Newborns Exposed to Opioids, Health Issues May Be the Least of Their Problems*, NAT'L PUB. RADIO (June 30, 2017, 4:00 PM), https://www.npr.org/sections/health-shots/2017/06/30/534911289/for-newborns-exposed-to-opi-oids-health-issues-may-be-the-least-of-their-problems [https://perma.cc/W9QQ-7BKD].

36.  *Id.*

37.  Christopher Hoffman, *More Mom, Fewer Drugs*, YALE MED. MAG. (2016), http://ymm.yale.edu/spring2016/news/chronicle/297566/ [https://perma.cc/CUD8-K2PX].

38.  *E.g.*, Alison Volpe Holmes, Emily C. Atwood, Bonny Whalen, Johanna Beliveau, J. Dean Jarvis, John C. Matulis, & Shawn L. Ralston, *Rooming-in to Treat Neonatal Abstinence Syndrome: Improved Family-Centered Care at Lower Cost*, 137 PEDIATRICS e1 (2016); Catherine Saint Louis, *A Tide of Opioid-Dependent Newborns Forces Doctors to Rethink Treatment*, N.Y. TIMES (July 13, 2017), https://www.nytimes.com/2017/07/13/health/opioid-addiction-babies.html [https://perma.cc/VP4F-8Q34].

39.  Miriam Jordan, *A Migrant Boy Rejoins His Mother, but He's Not the Same*, N.Y. TIMES (July 31, 2018), https://www.nytimes.com/2018/07/31/us/migrant-children-separation-anxiety.html [https://perma.cc/9RK6-CW59].

40.  *Separated Family Members Seek Monetary Damages from United States*, AM. IMMIGR. COUNCIL, http://americanimmigrationcouncil.org/litigation/separated-family-members-seek-mone-tary-damages-united-states [https://perma.cc/3LMF-V57M]; *see also* Lauren Aratani, *'Inexplicable Cruelty': US Government Sued over Family Separations at Border*, GUARDIAN (Feb. 11, 2019, 8:28 PM), https://www.theguardian.com/us-news/2019/feb/11/immigrant-families-sue-us-government-over-family-separation [https://perma.cc/8VUG-GW3C]; Nicole Houston & Issara Baumann, *Arnold & Porter Brings Legal Claims Against U.S. Government on Behalf of Parents and Children Separated at the Border*, ARNOLD & PORTER (Feb. 11, 2019), https://www.arnoldporter.com/en/perspectives/news/2019/02/arnold-porter-brings-legal-claims-against (last visited Mar. 2, 2019).

window into the trauma that children in the child welfare system experience every day across America.

### 2. Trauma Inherent in the Act of Removal

On top of the harms of separation from family, the act of removal itself—particularly the jarring way in which it is accomplished in the American system—is inherently traumatic. Dr. Monique Mitchell, an interdisciplinary professor who focuses on grief and loss, chronicled the results of a unique study of foster children and the feelings of grief and ambiguity that occurred when these children were separated from their families.[41]

Most notably, Dr. Mitchell reports that the simple act of removal, without regard to what happens afterwards, has significant effects on children. She states that while generally an adult might think of removal as a "quick, isolated, one-time event," for a child, it is a "significant turning point . . . that many children will relive over and over again in their minds."[42] This undoubtedly causes children immense trauma as they replay this horrible moment in their lives.

Being removed from one's family and entered into foster care is extremely harrowing and, for most children, completely unexpected.[43] Once the state receives a report of suspected abuse or neglect, a child may be roused from their sleep, taken from their bed in the middle of the night, put into a car with strangers, and dropped into a holding center overnight until their removal is approved by a court and a foster care placement is identified.[44] All of this is done with minimal explanation to the child.[45] Sometimes, if a placement is not available, children may even sleep in the offices of the state's child protective services.[46] When a placement is eventually identified, they are usually taken to a stranger's home, a

---

41. MONIQUE B. MITCHELL, THE NEGLECTED TRANSITION: BUILDING A RELATIONAL HOME FOR CHILDREN ENTERING FOSTER CARE (2016).

42. *Id.* at 12.

43. *See* Bruskas & Tessin, *supra* note 20, at 132.

44. *See* Larissa MacFarquhar, *When Should a Child Be Taken From His Parents,* NEW YORKER (Aug. 7, 2017), https://www.newyorker.com/magazine/2017/08/07/when-should-a-child-be-taken-from-his-parents [https://perma.cc/UH55-VBSR]; *see also* Kathryn Joyce, *The Crime of Parenting While Poor,* NEW REPUBLIC (Feb. 25, 2019), https://newrepublic.com/article/153062/crime-parenting-poor-new-york-city-child-welfare-agency-reform [https://perma.cc/6KYW-9FDJ] ("All too often, family defense advocates say, ACS caseworkers visit families in the middle of the night—a tactic that is supposed to be reserved for emergencies in which children are in imminent danger—demanding that parents wake their children so they can inspect their bodies for bruises, interview them alone, check their bedrooms, and take stock of the food in the kitchen cupboards.").

45. *Id.* ("If the children ask you where they're going next, or when they'll go home, or if they'll stay together with their brothers and sisters, you can't answer them, because you don't know.").

46. Robert T. Garrett, *Texas Foster-Care Crisis: Children Sleeping in CPS Offices Again as More Removed from Homes but State out of Places to Care for Them,* DALL. NEWS (Mar. 2016), https://www.dallasnews.com/news/politics/2016/03/17/texas-foster-care-crisis-children-sleeping-in-cps-offices-again-as-more-removed-from-homes-but-state-out-of-places-to-care-for-them [https://perma.cc/6GVX-3HHM].

group home, a residential treatment facility, or, in the best case scenario, a relative's home.[47]

Dr. Mitchell notes that, for most children, questions related to foster care are left unanswered during their transition. In the study, children reported receiving unsatisfactory answers from caseworkers to questions about why they had to leave, where they were going, who they would be placed with, and when they could go home.[48] As one twelve-year-old child put it, "It's like you're being kidnapped and nobody wants to tell you [anything]."[49] And often, this is because the caseworkers themselves do not have the answers.[50]

Children are therefore often upset not only *because* they are being removed, but also because of *how* they are removed. The caseworkers involved either do not provide them with adequate information, or provide them with incorrect information, leading to feelings of frustration and anxiety.[51]

### 3. Grief and Confusion Due to Separation from One's Family

Dr. Mitchell also documents the feelings of grief and ambiguity that occur when a child is separated from her family, as well as the stress that follows.[52] This is yet another distinct harm of removal. Dr. Mitchell identifies "guilt, post-traumatic stress disorder, isolation, substance abuse, anxiety, low self-esteem, and despair" as just some of the consequences that result from a failure to deal with these feelings of grief.[53] She concludes that children who are removed may mourn the loss of their parents as much as if they had died.[54]

Adding to the trauma is the possibility of separation from a sibling. Foster homes often cannot accommodate multiple children. In the late 1990s, the former legal director of The Door, a youth-centered non-profit organization in New York, conducted a survey of The Door's clients who were in foster care.[55] More than

---

47. Child Welfare Info. Gateway, U.S. Dep't of Health & Human Servs., *How the Child Welfare System Works*, FACTSHEET, Feb. 2013, at 1, 3, 6, https://www.childwelfare.gov/pubpdfs /cpswork.pdf [https://perma.cc/LCA9-QVN7]; *see also* Teresa Wiltz, *Giving Group Homes a 21st Century Makeover*, PEW CHARITABLE TR. (June 14, 2018), https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2018/06/14/giving-group-homes-a-21st-century-makeover [https://perma.cc/D4JD-8HCG] ("Group homes typically house 7 to 12 children, and adult supervisors. Residential treatment facilities are a cross between a group home and a hospital. They provide clinical treatment to kids with behavioral and mental health disorders.").

48. MITCHELL, *supra* note 41, at 10–27, 38–62, 78–94.

49. *Id.* at 11.

50. MacFarquhar, *supra* note 44.

51. *See* MITCHELL, *supra* note 41, at 5 ("Children will experience ambiguity when they have no information, too little information, or too much conflicting information to make sense of how an event will impact their personal well-being[.]").

52. *Id.*

53. *Id.*

54. *See id.* at 3.

55. Jill Chaifetz, *Listening to Foster Children in Accordance with the Law: The Failure to Serve Children in State Care*, 25 N.Y.U. REV. L. & SOC. CHANGE 1, 1 n. * & 2, 15–21 (1999).

ninety-two percent of those surveyed had siblings, but only about twenty-one percent were living with those siblings.[56] Twenty-three percent had siblings who were also in foster care but in a different placement.[57] Over forty-two percent said that they never visited with their siblings.[58]

Thus, children may experience not only the trauma of separation from parents (separate from the trauma created by the foster system itself)[59] but also estrangement from their siblings, like Rihana and her brother Kaden, discussed *supra* Part I.[60] Another study of removed children notes that many were reliant on their siblings and upset about being separated from them.[61] One child complained that he had been split up from his brothers and didn't know where they were.[62] Others expressed anger about separation from their absent siblings.[63] While the conversation is usually focused on separating children from their parents, it is important to be cognizant of additional trauma caused by separation from other family members.[64]

Removed children may also be alienated from their communities, and may be required to transfer schools, compounding feelings of loss and isolation. Foster children complain not only about losing their immediate families but also about losing contact with other relatives, friends, pets, and possessions.[65] Therefore, in addition to the harms suffered as a result of being separated from one's immediate family, removal also produced harm connected to separation from other important people and things.

Children in foster care also experience what Dr. Mitchell characterizes as "ambiguous loss," or a "lack of clarity about the psychological and/or physical presence of members of one's psychological family" (usually the biological family).[66] When a child is expected to be physically a part of a new family while she is still psychologically a part of her biological family, it can cause her distress and lead her to believe she doesn't belong to any family.[67] Relatedly, foster children may also experience "role ambiguity": confusion about their status in both their biological family and their "new" family.[68] That is, they may express concern about losing their identity in their biological family but be unsure about how to

---

56. *Id.* at 20.
57. *Id.*
58. *Id.*
59. *See* discussion *infra* Section II.B.
60. *See supra* text accompanying notes 1–9.
61. Whiting & Lee, *supra* note 27, at 292.
62. *Id.*
63. *Id.*
64. *See id.*
65. *Id.*
66. MITCHELL, supra note 41, at 81.
67. *See id.*
68. *See id.* at 65.

avoid doing so when they are not a part of that family on a daily basis.[69] They may struggle with continuous internal conflict "as they attempt to manage the continued separation, their desire for reconciliation, and their anxiety over attaching to the new foster parents."[70] One study found that foster children had trouble "conceptualizing where they came from and where they were currently living and struggled with their sense of belonging."[71] In sum, children in foster care may feel confused about the fact that their biological families are somewhat present in their lives but not in the way to which they are accustomed, and they may feel destabilized by having one foot in their biological family and another in their "new" one.

Children are also confused about "the reasons for being in [foster] care and what would happen in the future."[72] In one study, nearly every child interviewed expressed confusion of this sort.[73] When caseworkers deny children information regarding their case or the reasons that they are in care, they may compound existing feelings of helplessness and prevent children from processing the grief of separation from their families.[74] This lack of information further obfuscates already complicated feelings that these children are experiencing.

### 4. Unique Harms for Minority Children

Family courts are filled to the brim with indigent litigants of color. Anyone who has spent a day in family court has been struck by the overwhelming presence of Brown and Black faces, so it should come as no surprise that the majority of children in foster care are ethnic minorities.[75] Scholars have labeled family court the "poor person's court,"[76] and the child welfare system an "apartheid institution."[77] A former New York child protective specialist-turned-scholar went further, likening the child welfare system to slavery and advocating for the use of Thirteenth Amendment arguments in child welfare cases.[78] Others have compared the removal of African American children to the disproportionate removal of Native American children from their tribes[79] prior to the passage of the Indian Child

---

69. *See id.*

70. Goldsmith, Oppenheim, & Wanlass, *supra* note 16, at 1–2.

71. Bruskas & Tessin, *supra* note 20, at 138.

72. Whiting & Lee, *supra* note 27, at 292.

73. *Id.*

74. *Id.* at 293–94.

75. Child Welfare Info. Gateway, U.S. Dep't of Health & Human Servs., *Foster Care Statistics 2016*, NUMBERS & TRENDS, Apr. 2018, at 1, 8, https://www.childwelfare.gov/pubPDFs/foster.pdf [https://perma.cc/GX8Y-WU9A].

76. Melissa L. Breger, *The (In)visibility of Motherhood in Family Court Proceedings*, 36 N.Y.U. REV. L. & SOC. CHANGE 555, 557 (2012).

77. Beller, *supra* note 17, at 212.

78. Kurt Mundorff, *Children as Chattel: Invoking the Thirteenth Amendment to Reform Child Welfare*, 1 CARDOZO PUB. L., POL'Y & ETHICS J. 131, 131 & n.*, 138 (2003).

79. Brooks, *supra* note 25, at 49–50; Cynthia G. Hawkins-León, *The Indian Child Welfare Act and the African American Tribe: Facing the Adoption Crisis*, 36 BRANDEIS J. FAM. L. 201, 213 (1997) ("The figures for displaced or outplaced African American children are almost as high as

Welfare Act of 1978 (ICWA).[80] Even after ICWA, Native American children are still removed at higher rates than their peers.[81]

.    Those who have contact with the child welfare system have noted that case-workers often have biases against parents based on class, race, and poverty,[82] and that these biases may impact decisions about which children are removed.[83] Case-workers have sweeping discretion in determining which children to remove.[84] Because a neglect case can be opened if the caseworker believes there is *potential* for harm,[85] and in many cases a removal can occur prior to a final determination of that harm, there is a dire risk that caseworkers' subjective views of "good parent-ing"—and, worse yet, their subconscious biases—will determine whether or not a child is removed.[86] For example, a caseworker could file a case after learning that one parent came home intoxicated, despite the fact that the other parent was also at home and not under the influence of any substances because in her opinion, a parent should not be consuming large amounts of alcohol.

---

those figures reported for Native American children in the 1970's."); Stephanie Smith Ledesma, *The Vanishing of the African-American Family: "Reasonable Efforts" and Its Connection to the Dispro-portionality of the Child Welfare System*, 9 CHARLESTON L. REV. 29, 34–38 (2014) ("The impact [of African-American children disproportionately overrepresented in the child welfare and foster care system] is similar to the state of Indian children and Indian families prior to the passage of the Indian Child Welfare Act, where the rate of outplacements for Native American children far outpaced the number of Native American children in the general population.").

80.  Indian Child Welfare Act of 1978, 25 *U.S.C.* §§ 1901–63 (2016).

81.  Debra Utacia Krol, *Inside the Native American Foster Care Crisis Tearing Families Apart*, VICE (Feb. 8, 2018, 12:00 AM), https://www.vice.com/en_us/article/a34g8j/inside-the-native-amer-ican-foster-care-crisis-tearing-families-apart [https://perma.cc/F69T-2WZX]; Press Release, Jeremy Ratner, The Pew Charitable Tr., American Indian Children Overrepresented in Nation's Foster Care System, New Report Finds (Nov. 19, 2007) [hereinafter Ratner], https://www.pew trusts.org/en/about/news-room/press-releases-and-statements/2007/11/19/ american-indian-children-overrepresented-in-nations-foster-care-system-new-report-finds [https://perma.cc/HVS9-JAWS].

82.  *See, e.g.*, Jane C. Murphy, *Legal Images of Motherhood: Conflicting Definitions from Wel-fare "Reform," Family, and Criminal Law*, 83 CORNELL L. REV. 688, 707 (1998).

83.  Sheila D. Ards, Samuel L. Myers Jr., Patricia Ray, Hyeon-Eui Kim, Kevin Monroe, & Irma Arteaga, *Racialized Perceptions and Child Neglect*, 34 CHILD. & YOUTH SERVS. REV. 1480 (2012) (research explores racialized perceptions of child protective service workers and finds that respondents who see a neglectful situation with a Black baby are more likely to say that the depiction meets the definition of neglect and is reportable than when the same neglect situation involves a white baby); Katherine Elliott & Anthony Urquiza, *Ethnicity, Culture, and Child Maltreatment*, 62 J. SOC. ISSUES 787, 795 (2006); *see also* Child Welfare Info. Gateway, U.S. Dep't of Health & Hu-man Servs., *Racial Disproportionality and Disparity in Child Welfare*, ISSUE BRIEF, Nov. 2016, at 1, 6, https://www.childwelfare.gov/pubpdfs/racial_disproportionality.pdf [https://perma.cc/ DL8R-H654].

84.  Jaime Perrone, *Failing to Realize* Nicholson*'s Vision: How New York's Child Welfare System Continues to Punish Battered Mothers*, 20 J.L. & POL'Y 641, 660 (2012).

85.  N.Y. FAM. CT. ACT § 1012(f)(i) (McKinney 2019) (defines a "neglected child" as one "whose physical, mental or emotional condition has been impaired or is in imminent danger of be-coming impaired[.]").

86.  *See id.*

Researchers have found that racial bias exists at each stage of child welfare proceedings, from investigation to mitigation efforts to ultimate removal.[87] Statistics confirm that minority families, and Black families in particular, are less likely to receive in-home services meant to address underlying causes and prevent removal.[88] Thus, the state is more likely to permit white children to remain with their families, and take Black children away from theirs when faced with similar allegations.[89] For example, a 2002 study by the Minnesota Department of Human Services found that Black children are five times more likely to be removed than children of other races.[90] Sixteen years later, in 2018, Black children in Minnesota were still three times as likely as white children to be involved in the state's child welfare system.[91] As a result, in April of 2018, parents in Minnesota filed a Section 1983 lawsuit against the state alleging in part that child protective laws were being enforced in a discriminatory manner.[92]

Poverty, of course, plays a significant role in exacerbating racial disparities. This is particularly true, because (1) as many outsiders are surprised to learn, the majority of cases in the child welfare system deal with neglect, not abuse;[93] and (2) poverty is often conflated with neglect[94] or creates circumstances that may lead to neglect.[95] Indeed, research shows that "[i]nadequacy of income, more than any other factor, constitutes the reason that children are removed."[96] Child welfare

87.  Fred Wulczyn, Robert Gibbons, Lonnie Snowden, & Bridgette Lery, *Poverty, Social Disadvantage, and the Black/White Placement Gap*, 35 CHILD. & YOUTH SERVS. REV. 65, 66 (2013).

88.  Ledesma, *supra* note 79, at 36 (citing Susan L. Brooks & Dorothy E. Roberts, *Social Justice and Family Court Reform*, 40 FAM. CT. REV. 453, 454 (2002) (quoting CHILDREN'S BUREAU, U.S. DEP'T HEALTH & HUMAN SERVS., NATIONAL STUDY OF PROTECTIVE, PREVENTIVE, AND REUNIFICATION SERVICES DELIVERED TO CHILDREN AND THEIR FAMILIES (1994))) (finding disparities "even when [minority children] have the same problems and characteristics as white children").

89.  Dorothy E. Roberts, *Child Welfare and Civil Rights*, 2003 U. ILL. L. REV. 171, 172–73.

90.  CHILDREN'S SERVS. ADMIN., MINN. DEP'T OF HUMAN SERVS, STUDY OF OUTCOMES FOR AFRICAN AMERICAN CHILDREN IN MINNESOTA'S CHILD PROTECTION SYSTEM 4 (2002), https://www.leg.state.mn.us/docs/pre2003/mandated/020299.pdf [https://perma.cc/ZLV6-L3E4].

91.  Christopher Magan, *Black Children Disproportionately Removed from Their Families; State Lawmakers Seek Fix*, PIONEER PRESS (Apr. 10, 2018, 4:16 PM), https://www.twincities.com/2018/04/10/black-children-are-disproportionately-removed-from-their-families-state-lawmakers-seek-legislative-fix/ [https://perma.cc/8AFX-6ZJD].

92.  Complaint, Mitchell v. Dakota Cty. Soc. Servs., No. 18-cv-01091-WMW-BRT (D. Minn. Apr. 24, 2018).

93.  *See, e.g.*, Dorothy E. Roberts, *Poverty, Race, and New Directions in Child Welfare Policy*, 1 WASH. U. J.L. & POL'Y 63, 68–69 (1999).

94.  Tanya Asim Cooper, *Racial Bias in American Foster Care: The National Debate*, 97 MARQ. L. REV. 215, 228 (2013) ("That poverty has been confused and conflated with child neglect and even parental turpitude is not new."); *see also* MacFarquhar, *supra* note 44 ("You may be shocked by the living conditions you encounter, but you're not allowed to remove children solely because of poverty—if, for instance, there's no food in the kitchen because the parent's food stamps have run out—only for 'imminent risk' due to abuse or neglect. But it's often difficult to draw a line between poverty and neglect.").

95.  Christina White, *Federally Mandated Destruction of the Black Family: The Adoption and Safe Families Act*, 1 NW. J.L. & SOC. POL'Y. 303, 314–15 (2006).

96.  DUNCAN LINDSEY, THE WELFARE OF CHILDREN 175 (2d ed. 2004); *see also* Joyce, *supra*

experts Martin Guggenheim and Dorothy Roberts have separately noted that many children remain in foster care solely because their parents have inadequate housing.[97] This is particularly true in urban areas where affordable housing is scarce.[98] Finally, neglect cases may also be filed for failure to provide sufficient food or inadequate supervision due to lack of affordable childcare.[99] These are problems of family poverty, not of parental mistreatment.

This is significant in the context of race because Black children are nearly three times more likely to live in poverty than their white counterparts.[100] Black families also tend to have more contact with state actors, leaving them particularly vulnerable to additional state intervention.[101] Low-income families are more likely to seek medical care from emergency rooms or public clinics, use public transportation, and live in public housing, leading to more frequent interaction with government systems and increased visibility to child protection agencies.[102]

Additionally, if a family receives public benefits or "welfare," it may sacrifice its privacy. The Supreme Court has held that a family must allow state social workers to enter the home without a warrant to assess the family's worthiness to receive public assistance, to change the amount it receives, or to determine if there are any social services that could be provided.[103] In his dissent in that case, Justice Marshall noted that one of the arguments in favor of such visits was that they were necessary to protect children from "abuse" and "exploitation."[104] Marshall queried whether the majority would "sanction, in the absence of probable cause, compulsory visits to all American homes for the purpose of discovering child abuse," or whether the Court was holding "that a mother, merely because she is poor, is

---

note 44 (correlating the "ten neighborhoods with the highest number of ACS cases" in New York City with the "lowest incomes[ and] highest unemployment . . . in the city").

97. DOROTHY ROBERTS, SHATTERED BONDS: THE COLOR OF CHILD WELFARE 21, 35 (2002); Martin Guggenheim, *Somebody's Children: Sustaining the Family's Place in Child Welfare Policy*, 113 HARV. L. REV. 1716, 1724 (2000) (reviewing ELIZABETH BARTHOLET, NOBODY'S CHILDREN: ABUSE AND NEGLECT, FOSTER DRIFT, AND THE ADOPTION ALTERNATIVE (1999)); *see also* Asim Cooper, *supra* note 94, at 228 ("Three studies conducted in 1996 found that 30% of America's children in foster care were separated from their families because their parents lacked safe and affordable housing.").

98. *See* Guggenheim, *supra* note 97, at 1724 (citing Chicago and New York City as regularly placing children in foster care because of inadequate housing); *see also* ROBERTS, *supra* note 97, at 35 ("Children are routinely kept in foster care because their parents are unable to find decent affordable housing without public assistance. The court-appointed administrator of the District of Columbia's foster care system determined that as many as half of the children in foster care system determined that as many as half of the children in foster care could be immediately reunited with their parents if housing problems were resolved"); Joyce, *supra* note 44 (correlating the "ten neighborhoods with the highest number of ACS cases" in New York City with the "greatest income-to-rent disparities in the city").

99. *See* MacFarquhar, *supra* note 44 ("When a child has been left alone because his mother can't afford childcare and has to go to work, is that poverty or neglect?").

100. Roberts, *supra* note 89, at 176.

101. ROBERTS, *supra* note 97, at 29–30, 32.

102. *Id.*

103. Wyman v. James, 400 U.S. 309, 314, 326 (1971).

104. *Id.* at 341–42.

substantially more likely to injure or exploit her children."[105] Marshall's critique aside, decisions like this have left us with a society that "respect[s] the privacy and autonomy of middle-class families, but . . . accept[s] coercive intervention and intrusion in low-income families."[106]

Policing matters as well. It is no secret that police departments overpolice African American communities and "disproportionately subject African Americans to so-called 'quality of life' policing."[107] And just as many Americans "believe crime has a Black face,"[108] a perception exists that the face of abuse and neglect is also dark, leading to disproportionate targeting of African American and other ethnic minority families in the child welfare system.[109] Thus, due to bias and increased contact with state actors, parents of color are more likely to "catch a case" in the first place,[110] and then also more likely to have their children removed.[111] Further, once separated, these families are less likely to be reunified.[112]

---

105.  *Id.* at 342.

106.  Brooks, *supra* note 25, at 50; *see also* KHIARA M. BRIDGES, THE POVERTY OF PRIVACY RIGHTS 12–13 (2017) (arguing that poor mothers have been disenfranchised of their privacy rights); Michele Estrin Gilman, *The Class Differential in Privacy Law*, 77 BROOK. L. REV. 1389, 1391 (2012) (noting, *inter alia*, that courts often hold that the poor do not have reasonable expectations of privacy entitled to protection).

107.  Liyah Kaprice Brown, *Officer or Overseer?: Why Police Desegregation Fails as an Adequate Solution to Racist, Oppressive, and Violent Policing in Black Communities*, 29 N.Y.U. REV. L. & SOC. CHANGE 757, 762 (2005).

108.  Kenneth B. Nunn, *The "Darden Dilemma": Should African Americans Prosecute Crimes?*, 68 FORDHAM L. REV. 1473, 1490 (2000).

109.  Ards, Myers, Ray, Kim, Monroe, & Arteaga, *supra* note 83 (research explores racialized perceptions of child protective service workers and finds that respondents who see a neglect situation with a Black baby are more likely to say that the depiction meets the definition of neglect and is reportable than when the same neglect situation involves a white baby).

110.  *See id.* at 1482 ("[C]hildren of color are disproportionately exposed to the welfare system by being more likely to come into contact with the mandated reporters most likely to report observed or suspected instances of maltreatment.").

111.  NAT'L COUNCIL ON DISABILITY, *Chapter 5. The Child Welfare System: Removal, Reunification and Termination*, *in* ROCKING THE CRADLE: ENSURING THE RIGHTS OF PARENTS WITH DISABILITIES AND THEIR CHILDREN 71, 79 (2012), https://ncd.gov/sites/default/files/Documents/ NCD_Parenting_508_0.pdf [https://perma.cc/Z7PW-AVAP] ("African American and American Indian children are more likely than other children to be reported, investigated, substantiated, and placed in foster care. Thirty-one percent of the children in foster care are African American, double the percentage of African American children in the national population. Children of color, especially African American children and often American Indian children, are more likely to have longer placements in out-of-home care, are less likely to receive comprehensive services, and are less likely to reunify with their families than white children."); Nell Clement, *Do "Reasonable Efforts" Require Cultural Competence? The Importance of Culturally Competent Reunification Services in the California Child Welfare System*, 5 HASTINGS RACE & POVERTY L.J. 397 (2008) ("[C]ulturally diverse children are often more likely to be removed from their families than white children."); *see also* Asim Cooper, *supra* note 94, at 238 ("Known as the racial geography of foster care, those neighborhoods with poor African American and Native American families and the greatest involvement and concentration of foster care system surveillance are a perfect match.").

112.  *See, e.g.*, Fred Wulczyn, *Family Reunification*, 14 FUTURE CHILD. 94, 101 (2004) ("Among children admitted in 1990, Caucasian children were more likely to be reunited[.]").

The number of Hispanic[113] children in foster care is also disproportionately higher than Hispanics' representation in the general population. In 2016, Hispanics made up 17.6 percent of the national population,[114] yet constituted twenty-one percent of the foster care population.[115] This is likely due in part to the fact that Hispanic families are subject to anti-immigrant sentiments and "public perceptions that associate Latino immigrants with criminality, cultural deviance, and overarching illegality."[116]

A lack of understanding of cultural differences may lead to additional discrimination in legal systems. For example, one Hispanic parent who was facing termination proceedings due to her child's alleged malnourishment was told that her child's diet was "too heavy in dairy and lacking in vegetables and meat" because "his parents fed him milk, tortillas, sopas, eggs, and beans."[117] The caseworker failed to consider that this diet was influenced both by the parents' culture and their available financial resources.[118]

Indeed, this lack of concern for children who are considered "others" is evident at the highest levels of government. In discussing how the government would care for (primarily Hispanic) children separated from their parents at the border, White House Chief of Staff John F. Kelly infamously said these children would be "put into foster care or whatever."[119] Mr. Kelly clearly and disturbingly demonstrated that the government had given absolutely no thought to the trauma that would inevitably be inflicted on these children. In other words, he had not considered the harms of removal.

Native American children are also overrepresented in the child welfare system, despite ICWA, which is meant to keep Native American families together.[120] In 2007, in many states, the percentage of Native American children in foster care was well over twice the percentage of Native American children in the general

---

113. This article uses the term "Hispanic" as opposed to "Latino" or "Latinx" to reflect the language used by the United States government. *See, e.g.,* U.S. CENSUS BUREAU, FACTS FOR FEATURES: HISPANIC HERITAGE MONTH 2016 (2016), https://www.census.gov/newsroom/facts-for-features/2016/cb16-ff16.html [https://perma.cc/BG42-5LPB]; Child Welfare Info. Gateway, U.S. Dep't of Health & Human Servs., *supra* note 75, at 8–10.

114. U.S. CENSUS BUREAU, *supra* note 113, at 1.

115. Child Welfare Info. Gateway, U.S. Dep't of Health & Human Servs., *supra* note 75, at 8.

116. Anita Ortiz Maddali, *The Immigrant "Other": Racialized Identity and the Devaluation of Immigrant Family Relations,* 89 IND. L.J. 643, 656 (2014).

117. *Id.* at 689.

118. *Id.*

119. Philip Bump, *Why Separate Immigrant Children from Parents? The Politics of Fear—Just Indirectly,* WASH. POST: POLITICS (May 11, 2018), https://www.washingtonpost.com/news/politics/wp/2018/05/11/why-separate-immigrant-children-from-parents-the-politics-of-fear-just-indirectly/?utm_term=.04c74e2dbcba [https://perma.cc/Y2NE-7LM3] (quoting John Burnett & John Kelly, *Transcript: White House Chief of Staff John Kelly's Interview with NPR,* NAT'L PUB. RADIO (May 11, 2018, 11:36 AM), https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr [https://perma.cc/GM6T-SYY4]).

120. Virginia Drywater-Whitekiller, *Family Group Conferencing: An Indigenous Practice Approach to Compliance with the Indian Child Welfare Act,* 8 J. PUB. CHILD WELFARE 260, 260 (2014).

population.[121] In South Dakota, it was over three times as high while in Idaho, Minnesota, and Nebraska it was over six times as high.[122] Worse yet, the United States District Court of the Northern District of Texas recently found several of ICWA's provisions to be unconstitutional, such that the future of ICWA and the limited protections it currently extends to Native American children may now be in jeopardy.[123]

Racial disparities also exist in the rates at which abuse or neglect accusations are ultimately substantiated by the investigating agency.[124] Substantiation means that the agency investigating the allegation of abuse or neglect finds reason to believe that the parent has committed the acts alleged,[125] a finding that may be influenced by individual or institutional bias.[126] Native American families experience the highest rate of agency substantiation, followed by Black families, leading to court filings and the potential removal of these children.[127]

The removal of minority children from their communities inflicts additional, distinct trauma on these children.[128] Removal from one's family is harrowing enough, but these children are often removed not just from their family but also their entire community, affecting their sense of identity and "cultural belonging."[129] For children belonging to minority ethnic groups, ethnicity forms a more important part of their identity than it does for children in ethnic majorities.[130] As such, removal from their communities is more devastating to their development and sense of self.[131] Children who want to maintain their culture and their familial customs may not be able to do so in foster families belonging to a different race, culture, or religion, leading to additional feelings of loss and sadness for these children.[132]

---

121. Ratner, *supra* note 81; *see also* Utacia Krol, *supra* note 81 (citing NAT'L INDIAN CHILD WELFARE ASS'N, WHAT IS DISPROPORTIONALITY IN CHILD WELFARE 1 (2017), https://www.nicwa.cc/wp-content/uploads/2017/09/Disproportionality-Table.pdf [https://perma.cc/3GPY-262B]) (according to a study done in the last few years, "[n]ative children are placed into foster care at a rate 2.7 times greater than their proportion in the general population").

122. Ratner, *supra* note 81; *see also* Utacia Krol, *supra* note 81 (citing NAT'L INDIAN CHILD WELFARE ASS'N, *supra* note 121) (according to a study done in the last few years, "[n]ative children are placed into foster care at a rate 2.7 times greater than their proportion in the general population").

123. Brackeen v. Zinke, No. 4:17-CV-00868-O, 2018 WL 4927908, at *13–22 (N.D. Tex. Oct. 4, 2018).

124. CHILDREN'S BUREAU, U.S. DEP'T OF HEALTH & HUMAN SERVS., CHILD MALTREATMENT 2016, at 42 (2018), https://www.acf.hhs.gov/sites/default/files/cb/cm2016.pdf [https://perma.cc/LS27-V7AU].

125. *See id.* at 15.

126. Child Welfare Info. Gateway, U.S. Dep't of Health & Human Servs., *supra* note 83, at 6.

127. CHILDREN'S BUREAU, U.S. DEP'T OF HEALTH & HUMAN SERVS., *supra* note 124, at 42.

128. Clement, *supra* note 111, at 418–19.

129. *Id.* at 419.

130. *Id.*

131. *Id.*

132. MITCHELL, *supra* note 41, at 65; Child Welfare Info. Gateway, U.S. Dep't of Health & Human Servs., *Helping Your Child Transition from Foster Care to Adoption*, FACTSHEET FOR FAMILIES, July 2018, at 1, 6, https://www.childwelfare.gov/pubpdfs/f_transition.pdf

A scene from the popular television series *This Is Us* highlights these feelings. In the show, a white family adopts a Black child (presumably through the foster care system) after he is abandoned at a fire station by his drug-addicted father.[133] Throughout his life, the child carries a notebook everywhere he goes and keeps track of every Black person he ever meets.[134] Even though he was adopted into a loving and kind family, he has anxiety about the fact that he is often the only Black person in a room and wonders if any of the Black men he meets could be his father.[135] His feelings intensify when he goes on a college tour of Ta-Nehisi Coates' "Mecca," Howard University, a historically Black university,[136] where he is elated to be surrounded by people who look like him.[137]

Placing children with families who are ethnically different or speak a different language may make the children feel stigmatized, and thereby intensify feelings of isolation and anxiety.[138] For example, a situation as innocuous as a white foster parent being unable to style a Black child's hair in the way to which she is accustomed or a Spanish-speaking child being placed in a neighborhood where no one speaks Spanish may cause these problems. In one study, children of color reported discomfort with the idea of being placed with white families.[139] The effects of cultural alienation on children—as well as the effect of a sense of belonging—should not be discounted.

Additionally, the disproportionate and excessive removals of children in minority groups lead to problems not just for individual families, but also for the entire community. As Professor Dorothy Roberts has argued, "Family and community disintegration weakens [B]lacks' collective ability to overcome institutionalized discrimination and work toward greater political and economic strength."[140] Thus, continued targeted destruction of minority families leads to the devastation of the larger community, which, in turn, has long-term consequences for the children of those communities.

### B. Harms of Foster Care

Though child removals are often premised on the assumption that foster care is "better" than staying at home, the new settings are no panacea. In fact, foster care may inflict additional pain (on top of the harms created by removal and separation themselves), thereby producing *worse long-term outcomes* than if the child had remained at home. This section discusses the harms that children incur while

[https://perma.cc/GB5L-UM4G].

133. *This is Us: Kyle* (NBC television broadcast Oct. 11, 2016).

134. *This is Us: The Pool* (NBC television broadcast Oct. 18, 2016).

135. *Id.*

136. *See* TA-NEHISI COATES, BETWEEN THE WORLD AND ME 39–40 (2015).

137. *This is Us: Number Three* (NBC television broadcast Nov. 28, 2017).

138. Maurice Anderson & L. Oriana Linares, *The Role of Cultural Dissimilarity Factors on Child Adjustment Following Foster Placement*, 34 CHILD. & YOUTH SERVS. REV. 597, 600 (2012).

139. Whiting & Lee, *supra* note 27, at 291.

140. Roberts, *supra* note 89, at 179.

in the foster care system, including abuse; neglect; instability; and physical, mental, and sexual health problems.

### 1. Abuse and Neglect in Foster Care

In making removal decisions, courts rarely, if ever, consider the dangers inherent to the foster care system itself. The determination about whether to remove a child is usually made separate and apart from any information about where that child will go once removed.[141] Often, the child protective agency itself does not even know where the child will go when the removal is ordered.[142] This may lead to children being placed in processing centers or temporary foster homes while a permanent placement is identified.[143] And even when a home is located, little thought is given to which home would be the best place for a child. Rather, once a home meets standardized licensing requirements, it is usually deemed fit for any foster child.[144] There is no analysis of whether a specific home might be a good fit for a child or better equipped to deal with her particular issues.[145]

Despite the entire system being built on assumptions to the contrary, there is substantial evidence that children are more likely to be abused in foster care than in the general population (with their parents and other caregivers). The media is rife with stories of children abused in foster care,[146] and studies show that these are not simply sensationalized anomalies. One study in Baltimore found the substantiated rates of sexual abuse in foster homes to be more than *four times* that of the general population.[147] A similar study in Indiana found "three times more

---

141.  *See* MacFarquhar, *supra* note 44 ("If the children ask you where they're going next, . . . you can't answer them, because you don't know."); Garrett Therolf, *Private Foster Care System, Intended to Save Children, Endangers Some*, L.A. TIMES (Dec. 18, 2013, 4:00 AM), https://www.latimes.com/local/la-me-foster-care-dto-htmlstory.html#ixzz2phNFH4q4 [https://perma.cc/K7NY-DXQH] ("More than 59,000 children end up in California's foster care system because of abuse, neglect or abandonment. . . . Demand for . . . homes far outstrips availability, and it's not uncommon for social workers to make more than 100 calls before a vacant bed is secured[.]").

142.  MacFarquhar, *supra* note 44.

143.  *Id.* ("If you remove the children that night, you will take them to a processing center to be assigned to a temporary foster home.").

144.  David J. Herring, *Child Placement Decisions: The Relevance of Facial Resemblance and Biological Relationships*, 43 JURIMETRICS 387, 402 (2003).

145.  *Id.*

146.  *See, e.g.,* Michael Levenson, *Scores of Mass. Children Mistreated in Foster Homes,* BOS. GLOBE (Sept. 1, 2015), https://www.bostonglobe.com/metro/2015/09/01/report/KmxuJqL5RAFy9bPZ39WVIN/story.html [https://perma.cc/8DKJ-UPHX]; Brian Ross, *Six Kids Neglected by Florida Foster Care*, ABC NEWS (May 24, 2002), http://abcnews.go.com/2020/story?id=123897&page=1 [https://perma.cc/26L9-GK74]; Denis Slattery, *Long Island Foster Parent Charged with Beating, Sexually Abusing Children in His Care*, N.Y. DAILY NEWS (Mar. 19, 2016), http://www.nydailynews.com/news/crime/foster-parent-abused-children-20-years-prosecutors-article-1.2569892 [https://perma.cc/2J4R-FL7T].

147.  NAT'L COAL. FOR CHILD PROT. REFORM, FOSTER CARE VS. FAMILY PRESERVATION: THE TRACK RECORD ON SAFETY AND WELL-BEING 1, https://drive.google.com/file/d/0B291mw_hLAJsV1NUVGRVUmdyb28/view [https://perma.cc/YDK9-QX48] (citing MARY I. BENEDICT &

physical abuse and twice the rate of sexual abuse in foster homes than in the general population."[148] Indeed, foster children are particularly vulnerable to sexual abuse, perhaps due to the non-permanent and non-biological nature of the familial relationships (resulting in diminished incest taboos), and/or the cultural and class differences that may exist between the foster family and the children involved.[149]

Abuse in foster care may be caused by multiple factors, including poor training of foster parents, the lack of particularized matching of foster children with families, insufficient visitation from caseworkers, and failure to follow up on suspicions of abuse or referrals of allegations of abuse and/or neglect.[150]

In the Northwest Foster Care Alumni Study ("The Northwest Study") discussed in greater detail below,[151] around one-third of the participants reported maltreatment in their foster homes.[152] And, of course, actual abuse rates might be higher than reported. For foster care providers, reporting is essentially admitting their own failures and may open them up to scrutiny and liability. For foster care recipients, reporting may be embarrassing or traumatic.

Foster parents may also neglect their foster children in less overt ways. In a survey of foster children, twenty-two percent reported that they were not getting enough food.[153] Twenty-six percent revealed that they did not have appropriate seasonal clothing.[154] Ironically, similar conditions could have provided the impetus for a child's initial removal from their family, begging the question of whether many of these children could have been spared the trauma of removal by simply being provided with better resources in their own homes.

Even poor communication between foster parents and children may have more severe effects due to the new environment. One child reported that even though she wasn't technically being abused, she felt mentally and emotionally abused because every time she asked a question, she was met with sarcasm from

SUSAN ZURAVIN, FACTORS ASSOCIATED WITH CHILD MALTREATMENT BY FAMILY FOSTER CARE PROVIDERS 28–30 (1992)).

148.  *Id.* (citing J. William Spencer & Dean D. Knudsen, *Out-of-Home Maltreatment: An Analysis of Risk in Various Settings for Children*, 14 CHILD. & YOUTH SERVS. REV. 485 (1992)).

149.  Michael B. Mushlin, *Unsafe Havens: The Case for Constitutional Protection of Foster Children from Abuse and Neglect*, 23 HARV. C.R.-C.L. L. REV. 199, 205 (1988).

150.  OFFICE OF THE CITY COUNCIL PRESIDENT & THE CITY OF N.Y. HUMAN RES. ADMIN., THE FOSTER CARE PYRAMID: FACTORS ASSOCIATED WITH THE ABUSE AND NEGLECT OF CHILDREN IN FOSTER BOARDING HOMES 2, 53–55, 60–64, 69–73 (1982) (study found that inadequate home studies were correlated with abuse and neglect, and also found inadequate matching of foster children with families and procedures to decertify deficient foster homes); Mushlin, *supra* note 149, at 209–11.

151.  *See infra* text accompanying notes 234–39.

152.  PETER J. PECORA, RONALD C. KESSLER, JASON WILLIAMS, KIRK O'BRIEN, A. CHRIS DOWNS, DIANA ENGLISH, JAMES WHITE, EVA HIRIPI, CATHERINE ROLLER WHITE, TAMERA WIGGINS, & KATE HOLMES, IMPROVING FAMILY FOSTER CARE: FINDINGS FROM THE NORTHWEST FOSTER CARE ALUMNI STUDY 30 (2005), https://caseyfamilypro-wpengine.netdna-ssl.com/media/AlumniStudies_NW_Report_FR.pdf [https://perma.cc/6Y7Q-3RJY].

153.  Chaifetz, *supra* note 55, at 19.

154.  *Id.*

her foster parents.[155] Other children reported being treated differently or feeling judged by their foster parents, making bonding difficult.[156] This was particularly true when biological children also lived in the home.[157]

Overall, the weight of social scientific evidence suggests that children who are removed from their homes based on allegations of abuse or neglect often face *more* abuse and neglect in foster care. This is anathema to a system whose stated goal is child safety.

### 2. Foster Care Placement Instability

In additional to being potentially more dangerous than remaining at home, foster care placements are also notoriously unstable. The phenomenon of children being shifted from home to home without any permanency plan is often called "foster care drift."[158] Children may be placed in as many as fifteen homes in the first year of entering foster care alone.[159] In one study, twenty percent of children did not have stable placements for the first eighteen months they spent in care.[160] Another study found that the average child remained in foster care for a total of seven years in six different foster homes.[161] As a result, these children also changed schools an average of four times during their stay in foster care.[162]

The reasons for these moves vary greatly. On the one hand, a change in placement may be requested due to changes in the foster parents' lives such as moving, a new job, or a death (e.g. of the foster parents) or other emergency in the foster family.[163] Agencies may also make changes due to allegations of abuse or neglect against the foster parents.[164] On the other hand, the reasons for moving children are not always so serious. In one study, fourteen families requested that their foster child be removed because of their vacation plans.[165]

---

155. MITCHELL, *supra* note 41, at 60.

156. *See* Heather L. Storer, Susan E. Barkan, Emma L. Sherman, Kevin P. Haggerty, & Leah M. Mattos, *Promoting Relationship Building and Connection: Adapting an Evidence-Based Parenting Program for Families Involved in the Child Welfare System*, 34 CHILD. & YOUTH SERVS. REV. 1853, 1858 (2012).

157. *See id.*

158. *See* Carla Bradley & Cynthia G. Hawkins-León, *The Transracial Adoption Debate: Counseling and Legal Implications*, 80 J. COUNSELING & DEV. 433, 436 (2002).

159. Bruskas & Tessin, *supra* note 20, at 132.

160. David M. Rubin, Amanda L. R. O'Reilly, Xianqun Luan, & A. Russell Localio, *The Impact of Placement Stability on Behavioral Well-Being for Children in Foster Care*, 119 PEDIATRICS 336, 341 (2007).

161. Bruskas & Tessin, *supra* note 20, at 134.

162. *Id.*

163. *See* NANCY ROLOCK, EUN KOH, TED CROSS, JENNIFER EBLEN MANNING, MULTIPLE MOVE STUDY: UNDERSTANDING REASONS FOR FOSTER CARE INSTABILITY 7, 19 (2009), https://cfrc.illinois.edu/pubs/rp_20091101_MultipleMoveStudyUnderstandingReasonsForFosterCareInstability.pdf [https://perma.cc/DE9H-Y4JV]; Sigrid James, *Why Do Foster Care Placements Disrupt? An Investigation of Reasons for Placement Change in Foster Care*, 78 SOC. SERV. REV. 601, 611 (2004).

164. ROLOCK, KOH, CROSS, & MANNING, *supra* note 163, at 7.

165. James, *supra* note 163, at 611.

*THE HARM OF CHILD REMOVAL*

Child-behavior-related moves may occur due to serious concerns such as drug use, fire setting, physical abuse of others, self-harm, refusal to go to school, stealing, or inappropriate sexual behavior.[166] But foster families may also have unrealistic expectations for their foster children.[167] One study found that many children were moved because of behavior that was developmentally appropriate or predictable for their ages.[168] For example, toddlers were removed because of tantrums and related behaviors and teenagers removed for being disrespectful or refusing to do chores.[169] One child was moved at least twice because her foster parents reacted negatively to her sexual orientation.[170] The same study found that multiple children were removed when foster parents failed to commit to those who exhibited distress or acted out for discrete periods of time.[171] As one teenager put it, "I know in my experience with my foster mom[,] . . . she didn't . . . adapt to the fact that I was also a normal teenager, so I was gonna do normal teenager things like talk back and stuff like that."[172]

Whatever the cause, these frequent moves—whereby children are "passed from one foster home to another with no constancy of love, trust, or discipline"[173]—have tangible negative consequences and result in worse outcomes for children. For example, being labeled a "foster child" may also suggest to a child that either she or her parents have failed in some way, and as a result she is "bad."[174] Being moved from one home to another reinforces this impression and is incredibly detrimental to a child's psyche.[175] Additionally, multiple placements may intensify existing trauma and make it difficult for children to develop relationships with primary caregivers or others in their lives.[176] The fact and multiplicity of placements affect children's ability to form healthy attachments to others and long-term relationships.[177]

According to one study, children with unstable foster care placements experience between thirty-six and sixty-three percent increased risk of behavioral problems compared to those with more stable foster homes.[178] On top of the emotional

166.  *Id.* at 602–03.

167.  *Id.* at 602.

168.  ROLOCK, KOH, CROSS, & MANNING, *supra* note 163, at 12.

169.  *Id.*

170.  *Id.* at 11.

171.  *Id.* at 12.

172.  Storer, Barkan, Sherman, Haggerty, & Mattos, *supra* note 156, at 1857.

173.  Santosky v. Kramer, 455 U.S. 745, 789 (1982) (Rehnquist, J., dissenting).

174.  Ana M. Novoa, *Count the Brown Faces: Where is the "Family" in The Family Law of Child Protective Services*, 1 SCHOLAR 5, 31 (1999).

175.  *Id.*

176.  Bruskas & Tessin, *supra* note 20, at 131.

177.  Vivek Sankaran & Christopher Church, *Easy Come, Easy Go: The Plight of Children Who Spend Less Than Thirty Days in Foster Care*, 19 U. PA. J.L. & SOC. CHANGE 207, 212 (2016) (citing Philip A. Fisher, Mark J. Van Ryzin, & Megan R. Gunnar, *Mitigating HPA Axis Dysregulation Associated with Placement Changes in Foster Care*, 36 PSYCHONEUROENDOCRINOLOGY 531, 532 (2011)).

178.  Rubin, O'Reilly, Luan, & Localio, *supra* note 160, at 341.

*N.Y.U. REVIEW OF LAW & SOCIAL CHANGE* [Vol. 43:523

harms related to the multiple transitions themselves, the likelihood of abuse has been shown to increase every time a child is moved to a new home.[179]

Research has also shown that children who experience initial instability have higher rates of further instability and are less likely to find permanent homes[180] or to be reunified with their biological families.[181] Thus, instability in foster homes results in a vicious cycle wherein those who begin with foster home instability are unable to recover from it and continue to face disruptions throughout their time in care.

### 3. Physical and Sexual Health Problems

Foster parents are responsible for ensuring that children in their care receive adequate medical and dental care[182] and the state provides free health care to foster children to ensure that these needs can be met.[183] Yet medical and dental conditions are routinely ignored, under-identified, and untreated.[184] According to the American Academy of Pediatrics, "[c]hildren and adolescents in foster care have a higher prevalence of physical, developmental, dental, and behavioral health conditions than any other group of children."[185] This is true even when accounting

---

179. Mushlin, *supra* note 149, at 208.

180. Theodore P. Cross, Eun Koh, Nancy Rolock, & Jennifer Eblen-Manning, *Why Do Children Experience Multiple Placement Changes in Foster Care? Content Analysis on Reasons for Instability*, 7 J. PUB. CHILD WELFARE 39, 40 (2013).

181. James, *supra* note 163, at 601.

182. *See, e.g.*, MD. SOC. SERVS. ADMIN., MARYLAND RESOURCE PARENT HANDBOOK 8 (2016), http://dhr.maryland.gov/documents/Foster%20Care/ResourceParentHandGuide2016
_web.pdf [https://perma.cc/5K2G-HNK5] ("As directed by the local department, resource parents [in Maryland] meet the needs of their foster child by scheduling medical, dental and/or psychological/psychiatric appointments and providing transportation to those appointments."); Lloyd Nelson, *Foster Children and Medical Care*, EMBRELLA (Oct. 23, 2015), http://foster-adoptive-kinship-family-services-nj.org/foster-children-and-medical-care/ [https://perma.cc/PJ7W-EK8F] ("[New Jersey] foster parents are responsible for obtaining appropriate medical and dental care for the child or children in their homes on a routine and emergency basis.").

183. *Health Oversight for Children and Youth in Foster Care*, NAT'L CONF. ST. LEGISLATURES (June 14, 2017), http://www.ncsl.org/research/human-services/health-oversight-for-children-and-youth-in-foster-care.aspx [https://perma.cc/GHD6-TKU4]; *see also* Child Welfare Info. Gateway, U.S. Dep't of Health & Human Servs., *Health-Care Coverage for Youth in Foster Care—and After*, ISSUE BRIEF, May 2015, at 1, 7,
https://www.childwelfare.gov/pubPDFs/health_care_foster.pdf [https://perma.cc/H2PB-72GU].

184. *See* TASK FORCE ON HEALTH CARE FOR CHILDREN IN FOSTER CARE, AM. ACAD. OF PEDIATRICS, FOSTERING HEALTH: HEALTH CARE FOR CHILDREN AND ADOLESCENTS IN FOSTER CARE ix (2d ed. 2005), https://www.aap.org/en-us/advocacy-and-policy/aap-health-initiatives/healthy-foster-care-america/documents/fosteringhealthbook.pdf [https://perma.cc/6TZK-2LLW] ("Children and adolescents in foster care have a higher prevalence of physical, developmental, dental, and behavioral health conditions than any other group of children. Typically these health conditions are chronic, under-identified, and undertreated[.]").

185. *Id.*

for poverty: foster children have been shown to have higher rates of health problems than other poor children receiving Medicaid.[186]

One study of foster children and their medical care yielded alarming findings.[187] Sixty-eight percent of the studied children had not been vaccinated for mumps; thirty-six percent had not received vaccination for measles; and twenty-three percent had not received protection from diphtheria, tetanus, and pertussis.[188] Fourteen percent had received no medical examination before entering care, over forty percent had not received adequate optical or dental care, and only a quarter of those who had identified emotional or developmental problems had received treatment.[189] Such failures to promptly address children's medical needs may lead to long-term complications. Inconsistent dental care, for example, can lead to severe damage that takes years to repair.[190]

In another troubling set of results, the United States General Accounting Office issued a report on foster children in New York City, Philadelphia, and Los Angeles, revealing that "an estimated 12 percent of young foster children received no routine health care, 34 percent received no immunizations, and 32 percent had at least some identified health needs that were not met."[191] Further, the office noted that, due to a lack of information, it was possible the figures of underattended youth were in fact higher, as children who were categorized as having received adequate medical care may have only had one visit to a medical professional, instead of the ongoing treatment that they needed.[192]

Medical care can fall through the cracks for myriad reasons including multiple foster care placements and changing medical caregivers.[193] Placement changes make it difficult for children to have continued access to an existing health care provider, thereby preventing the development of a consistent relationship and hindering the medical provider's ability to get a complete picture of the child and her medical history.[194]

---

186. *See* SUSAN COSGROVE, CARLTON FROST, REBECCA CHOWN, & TAWSIF ANAM, WIS. DEP'T OF HEALTH SERVS. & WIS. DEP'T OF CHILDREN & FAMILIES, STRENGTHENING HEALTH OUTCOMES FOR FOSTER CARE CHILDREN 15 (2013), https://www.lafollette.wisc.edu/images/publications/workshops/2013-DCF-DHS.pdf [https://perma.cc/5X7Q-6LJG].

187. Margaret R. Swire & Florence Kavaler, *Health Supervision of Children in Foster Care*, 57 CHILD WELFARE 563 (1978).

188. *Id.* at 565.

189. Mushlin, *supra* note 149, at 208–09 (citing FLORENCE KAVALER & MARGARET R. SWIRE, FOSTER-CHILD HEALTH CARE 142, 146 (1983)).

190. *See* Ann Carrellas, Angelique Day, & Tamara Cadet, *Oral Health Care Needs of Young Adults Transitioning from Foster Care*, 43 HEALTH & SOC. WORK 22, 27 (2018).

191. U.S. GEN. ACCOUNTING OFFICE, HEHS-95-114, FOSTER CARE: HEALTH NEEDS OF MANY YOUNG CHILDREN ARE UNKNOWN AND UNMET 2 (1995), https://www.gao.gov/assets/230/221275.pdf [https://perma.cc/STV9-ADT2].

192. *Id.* at 5.

193. Natalie McGill, *Making Health a Priority for Children in Foster Care System*, NATION'S HEALTH, Sept. 2016, at 14, 14.

194. Robin Mekonnen, Kathleen Noonan, & David Rubin, *Achieving Better Health Care Outcomes for Children in Foster Care*, 56 PEDIATRIC CLINICS N. AM. 405, 406–07 (2009).

Foster children also experience poorer sexual health outcomes than their peers in the general population. Foster children engage in sexual behavior at a younger age than their non-foster care counterparts.[195] They are also more likely to engage in riskier sexual behavior such as unprotected sex.[196] As a result, teenage pregnancy is higher in the foster care population.[197] Research demonstrates that a "history of childhood or adolescent sexual abuse is associated with unprotected sexual intercourse, multiple sexual partners, early sexual initiation, teen pregnancy involvement, and exchange of sex for money or drugs."[198] While it is possible that some of this behavior could be connected to past sexual abuse in biological families, such outcomes could also be connected to the high rates of sexual abuse in foster care.[199]

Foster children may also be more likely to use illicit drugs. One study found that almost half of the foster children studied had used illicit drugs at some point and more than a third of them met the criteria for a substance use disorder.[200] Another study found that children whose foster care stay was a year or more had over seven times the rate of drug dependence and almost twice the rate of alcohol dependence as the general population.[201]

Children in foster care are therefore more likely to experience adverse health effects caused by drug use[202] and risky sexual behavior[203] and are also less likely to receive adequate medical care[204] during their time in foster care. This combination puts children in foster care at risk for serious long-term health problems in the future.[205]

---

195. Erin Kim Hazen, *Youth in Foster Care: An Examination of Social, Mental, and Physical Risks*, N.Y.U. APPLIED PSYCHOL. OPUS (Fall 2014), https://steinhardt.nyu.edu/appsych/opus/issues/2014/fall/hazen [https://perma.cc/8P6Z-F9BP].

196. *Id.*

197. Krista Brooks, *Teen Pregnancy and Foster Care*, NAT'L CTR. HEALTH RES., http://www.center4research.org/teen-pregnancy-foster-care/ [https://perma.cc/J4F4-LLLX] ("Teenage girls in the foster care system are twice as likely to get pregnant before turning 19 than teenage girls who are not in foster care."); *see also* Hazen, *supra* note 195.

198. Yuko Homma, Naren Wang, Elizabeth Saewyc, & Nand Kishor, *The Relationship Between Sexual Abuse and Risky Sexual Behavior Among Adolescent Boys: A Meta-Analysis*, 51 J. ADOLESCENT HEALTH 18, 19 (2012).

199. *See supra* notes 147–49 and accompanying text.

200. Michael G. Vaughn, Marcia T. Ollie, J. Curtis McMillen, Lionel Scott Jr., & Michelle Munson, *Substance Use and Abuse Among Older Youth in Foster Care*, 32 ADDICTIVE BEHAVS. 1929, 1932, 1935 (2007).

201. Peter J. Pecora, Catherine Roller White, Lovie J. Jackson, & Tamera Wiggins, *Mental Health of Current and Former Recipients of Foster Care: A Review of Recent Studies in the USA*, 14 CHILD & FAM. SOC. WORK 132, 139 (2009).

202. *See supra* notes 200–201 and accompanying text.

203. *See supra* notes 197–98 and accompanying text.

204. *See supra* notes 184–94 and accompanying text.

205. *See* TASK FORCE ON HEALTH CARE FOR CHILDREN IN FOSTER CARE, AM. ACAD. OF PEDIATRICS, *supra* note 184, at ix.

*4. Mental Health Effects and Consequences of Foster Care Placement*

In addition to the emotional harms described above, foster children have an "increased risk for mental health disorders."[206] As a result, children in foster care have higher rates of psychiatric problems than the general population.[207] In some cases this may be related to mistreatment prior to removal, but it can also be triggered or exacerbated by numerous foster care placements and the feelings of loss described earlier.[208] One study concluded that children who moved foster care placements more frequently were more likely to develop emotional and behavioral problems than children in a stable foster care setting.[209]

The mental health consequences of foster care placement can be serious. In one study, 54.4 percent of a population of 659 foster care alumni[210] were diagnosed with mental health disorders including depression, social phobia, post-traumatic stress disorder ("PTSD"), and drug dependence, and about one in five of the same population had three or more mental health problems.[211] Another study showed that "up to about 80% of [foster] children exhibit a serious behavioral or mental health problem requiring intervention."[212] Researchers have found that forty-three percent of foster care participants report diagnoses of depression and twenty-nine percent report suffering from PTSD.[213] Other studies have found that the rate of PTSD in foster children is almost twice as high as the rate in United States war veterans.[214]

Many of these youths suffer from multiple problems that could have extreme consequences later in life. One study showed that nearly twenty percent of young people who had been in foster care had three or more current psychiatric problems as compared to around three percent of those who had never been in foster care.[215] Individuals with depression or PTSD may later experience "medical conditions such as heart disease, high blood pressure, diabetes, or cancer."[216] Depression and PTSD often occur together but may also occur with other mental health concerns

---

206.  Peter J. Pecora, Peter S. Jensen, Lisa Hunter Romanelli, Lovie J. Jackson, and Abel Ortiz, *Mental Health Services for Children Placed in Foster Care: An Overview of Current Challenges*, 88 CHILD WELFARE 5, 10 (2009).

207.  Bruskas & Tessin, *supra* note 20, at 132.

208.  *Id.* at 132; *see* discussion *supra* Section II.A.3.

209.  Cross, Koh, Rolock, & Eblen-Manning, *supra* note 180, at 54. The authors acknowledge that it is unclear whether instability led to increased likelihood of diagnosis or diagnosis increased the probability of instability but believed that both scenarios were supported by research. *Id.*

210.  PECORA, KESSLER, WILLIAMS, O'BRIEN, DOWNS, ENGLISH, WHITE, HIRIPI, WHITE, WIGGINS, & HOLMES, *supra* note 152, at 1.

211.  *Id.* at 1.

212.  Pecora, Jensen, Romanelli, Jackson, & Ortiz, *supra* note 201, at 6.

213.  Bruskas & Tessin, *supra* note 20, at 134.

214.  *Id.* at 132 (citing PECORA, KESSLER, WILLIAMS, O'BRIEN, DOWNS, ENGLISH, WHITE, HIRIPI, WHITE, WIGGINS, & HOLMES, *supra* note 152, at 1).

215.  PECORA, KESSLER, WILLIAMS, O'BRIEN, DOWNS, ENGLISH, WHITE, HIRIPI, WHITE, WIGGINS, & HOLMES, *supra* note 152, at 34.

216.  Pecora, Jensen, Romanelli, Jackson, & Ortiz, *supra* note 201, at 16.

such as "aggression, attention deficits, eating disorders, alcohol or drug addictions, and suicidal tendencies."[217]

. Mental health services in the foster care system are desperately needed yet drastically under-accessed. Research shows that "three of four children who came to the attention of the child welfare systems because of a child abuse and neglect investigation and who had clear clinical impairment had not received any mental health care within 12 months after the investigation."[218] Black youth are even less likely than white youth to receive mental health care.[219] And while there is limited available data, "it appears that much of foster care is delivered without significant mental health services for children other than referral to mental health agencies for treatment."[220]

Once discharged from foster care, the problem of inadequate mental health services is compounded further. Black and Hispanic young adults are less likely to seek mental health treatment than their white counterparts due to "perceived racism in the mental health system, fear of treatment or hospitalization, lack of mental health professionals of the same race/ethnicity, and cultural mistrust."[221] Combined, these conditions lead to a significant population of young people of color who were never treated for their mental health issues as children and are now left to cope as adults without support or treatment.

### 5. Long-Term Outcomes for Foster Children

Having outlined the myriad emotional, psychological, physical, and sexual health challenges facing foster children, it is perhaps unsurprising that these children have unfavorable long-term outcomes across virtually all metrics of success—and notably worse outcomes than their counterparts who remain with their families. Numerous studies document this phenomenon. MIT economist Joseph Doyle found through multiple studies that children who remained at home fared better than otherwise similarly situated children who were placed in foster care.[222] He found that foster children had greater involvement with the criminal justice system, were more likely to become pregnant as teenagers, and generally earned less than their similarly situated peers.[223] They were also more likely to become

---

217.  *Id.* at 16–17.

218.  *Id.* at 19.

219.  Ann F. Garland, John A. Landsverk, & Anna S. Lau, *Racial/Ethnic Disparities in Mental Health Service Use Among Children in Foster Care*, 25 CHILD. & YOUTH SERVS. REV. 491, 493–97 (2003).

220.  Pecora, Jensen, Romanelli, Jackson, & Ortiz, *supra* note 201, at 20.

221.  Lionel D. Scott, Jr. & Larry E. Davis, *Young, Black, and Male in Foster Care: Relationship of Negative Social Contextual Experiences to Factors Relevant to Mental Health Service Delivery*, 29 J. ADOLESCENCE 721, 725 (2006).

222.  *See, e.g.*, Joseph J. Doyle Jr., *Child Protection and Child Outcomes: Measuring the Effects of Foster Care*, 97 AM. ECON. REV. 1583, 1583 (2007) ("Those placed in foster care are far more likely than other children to commit crimes, drop out of school, join welfare, experience substance abuse problems, or enter the homeless population.").

223.  *See id.* at 1607.

involved with the juvenile justice system and require emergency healthcare within a year of their child protective services report.[224]

Other studies have found that children who spend time in foster care were more likely to have alcohol or drug addictions,[225] more likely to have a criminal record, and less likely to have graduated high school.[226] Other research shows that as children become adults, they are more likely to require counseling for psychological or emotional problems and to attend substance abuse treatment programs.[227]

That study, dubbed "The Midwest Study," highlighted the difficulties surrounding foster children's transition to adulthood. The study found that foster care alumni were less likely than their peers to succeed academically[228] or to have economic stability.[229] Specifically, the Study found that while around three-quarters of the former foster youth surveyed had a high school diploma or GED, only seven percent of women and five percent of men had an associate's degree, much lower than the percentage of youth in the general population.[230] Further, fewer than half of the Study's participants had a job and the majority of those who were working did not make a living wage—half of those working reported an annual income of $8,000 or less.[231] As a result, nearly thirty percent of those surveyed had experienced food insecurity, with two-thirds of the females and more than twenty-five percent of the males receiving food stamps in the previous year.[232] Nearly forty percent had been homeless or lacked stable housing at some point since leaving foster care.[233]

The Northwest Study also documented grave outcomes for life after foster care. This study featured adults who received support from social services organizations in multiple cities throughout the northwestern United States,[234] "focus[ing] on identifying how alumni were faring and what foster care experiences

224. Sankaran & Church, *supra* note 177, at 212 (citing Joseph J. Doyle, Jr., *Causal Effects of Foster Care: An Instrumental-Variables Approach*, 35 CHILD. & YOUTH SERVS. REV. 1143, 1148–49 (2013)).

225. *See* Catherine Roller White, Kirk O'Brien, James White, Peter J. Pecora, & Chereese M. Phillips, *Alcohol and Drug Use Among Alumni of Foster Care: Decreasing Dependency Through Improvement of Foster Care Experiences*, 35 J. BEHAV. HEALTH SERVS. & RES. 419, 420 (2008).

226. *See* Doyle, *supra* note 222, at 1583.

227. MARK E. COURTNEY, AMY DWORSKY, JOANN S. LEE, & MELISSA RAAP, CHAPIN HALL, UNIV. OF CHI., MIDWEST EVALUATION OF THE ADULT FUNCTIONING OF FORMER FOSTER YOUTH: OUTCOMES AT AGES 23 AND 24, at 44–45 (2010), https://www.chapinhall.org/wp-content/uploads/Midwest-Eval-Outcomes-at-Age-23-and-24.pdf [https://perma.cc/Z3UZ-RBN7].

228. *Id.* at 95.

229. *Id.*

230. *Id.*

231. *Id.*

232. *Id.*

233. *Id.* at 96.

234. PECORA, KESSLER, WILLIAMS, O'BRIEN, DOWNS, ENGLISH, WHITE, HIRIPI, WHITE, WIGGINS, & HOLMES, *supra* note 152, at 1, 10.

resulted in positive outcomes."[235] While this study found that about eighty percent of foster care alumni in the workforce were employed, one-third of the interviewed alumni had incomes at or below the poverty line.[236] Further, one-third had no health insurance and more than one in five had experienced homelessness after leaving foster care.[237] Although not a direct comparison, of all the alumni surveyed between the ages of twenty to thirty-three, only 1.8 percent had completed a bachelor's degree program (compared to twenty-four percent in the general population of the same age).[238] Of those alumni older than twenty-five, only 2.7 percent had completed a bachelor's degree.[239]

Despite the mountain of evidence that foster children fare worse than their similarly situated peers across the board, none of this information is considered in child welfare proceedings in most states when deciding whether to remove children from their homes.[240] This, too, appears antithetical to a system ostensibly designed to protect children.

### III.
### HOW THE LAW CONTRIBUTES TO HARM

Part II established the social science bases for the harm of child removal. Part III proceeds to examine how the current law around family removal contributes to that harm, namely, by failing to take the harm into account.

In determining how the harm of removal can be integrated into current law, it is important first to understand the historical and constitutional underpinnings of the child welfare system. Removal without consideration of its effects on the child was a part of "child welfare" before any public legal systems were in place. As the law developed, it was driven by reactionary, race-based, and poverty-based panic, and focused primarily, if not exclusively, on the risk to children of *remaining with* their allegedly unfit parents. There was virtually no legal consideration of the harm of *removal from* their parents. This pattern continues to this day.

#### *A. The First Child Removals*

The first hint of organized child welfare intervention was in the mid-nineteenth century, when New York City was facing calamitous levels of poverty.[241] Missionary Charles Loring Brace helped to found the New York Children's Aid

---

235.  *Id.* at 1.
236.  *Id.* at 2.
237.  *Id.*
238.  *Id.*
239.  *Id.*
240.  *See, e.g.* Liebmann, *supra* note 14, at 148 ("Across the board, removal standards fail to acknowledge or incorporate into the analysis the poor outcomes for many foster children with respect to education and financial wellbeing.").
241.  JOHN E. B. MYERS, CHILD PROTECTION IN AMERICA: PAST, PRESENT, AND FUTURE 18 (2006).

Society in an effort to focus solely on the needs of poor children.[242] These initial attempts at intervention were made by a private citizen, not the state, and were focused on shielding children from the harmful effects of extreme poverty rather than child protection as we understand it today (although Brace was cognizant of the existence of abuse and neglect).[243] To his credit, Brace created schools and lodging houses that offered food, housing, and education to homeless and destitute children.[244] Brace's other solution to the poverty problem, however, was the creation of "orphan trains."[245] These trains carried "nearly 100,000 New York City children to new homes in the Midwest between 1854 and 1929."[246] Brace believed that the only hope for many of these children was a "fresh start" in the "wholesome environs of midwestern farms and villages."[247]

These historical movements were the precursors to early removals and foster care placements.[248] And, as we still see today, poverty was deeply intertwined with the decision concerning what was in children's best interests. Just as the Children's Aid Society focused on taking children out of poverty and placing them somewhere "better," in our current child welfare system children are still taken from poor parents far more often than from wealthy parents.[249]

Children's Aid itself recognizes today that the orphan train movement had its "pitfalls."[250] Contemporary criticisms of this historical movement mirror present-day concerns about the modern child welfare system. Some critics were apprehensive that orphans were placed without proper investigation prior to placement or follow-up once the children were in new homes.[251] Others questioned whether Brace was motivated by cultural difference, arguing that he intended to save Catholic children by relocating them to Protestant homes.[252]

---

242. *Id.* at 18–19.

243. *Id.*

244. *Id.* at 20.

245. *Id.* at 21.

246. *Id.*

247. *Id.*

248. Angelique Brown, *Orphan Trains (1854-1929)*, VCU LIBR. SOC. WELFARE HIST. PROJECT (2011), https://socialwelfare.library.vcu.edu/programs/child-welfarechild-labor/orphan-trains/ [https://perma.cc/L23H-DM6F].

249. Andrea Charlow, *Race, Poverty, and Neglect*, 28 WM. MITCHELL L. REV. 763, 764–65 (2001) ("Consistent with its origins, the current child welfare system continues to remove more poor children from their families than their wealthier counterparts.").

250. *The Orphan Train Movement*, CHILD. AID, http://www.childrensaidnyc.org/about/orphan-train-movement [https://perma.cc/7VPJ-RSDY].

251. Rebecca S. Trammell, *Orphan Train Myths and Legal Reality*, 5 MOD. AM. 3, 5 (2009) (citing Tim Hacsi, *From Indenture to Family Foster Care: A Brief History of Child Placing*, 74 CHILD WELFARE 162, 168–69 (1995)).

252. MYERS, *supra* note 241, at 23; *but see* STEPHEN O'CONNOR, ORPHAN TRAINS: THE STORY OF CHARLES LORING BRACE AND THE CHILDREN HE SAVED AND FAILED 172 (2001) ("Although it is perfectly true that Brace and many of his coworkers were deeply prejudiced against Catholics, and that most Catholic children who were sent west did in fact end up being raised Protestant, their conversion was never an overt aim of the charity[.]").

Further, while some of the children on the orphan trains were truly orphans, others had at least one living parent.[253] Children were allegedly not supposed to be removed without parental consent.[254] Members of the society "told the children and their parents of the great advantages of going West; however, they were not to induce children or to take them without the written or witnessed verbal consent of their parents."[255] Yet at least one family petitioned the court to have their children returned after the police committed the children to the Children's Aid Society, suggesting that they did not consent to the removal in the first place.[256] Thus, many of the problems critics of the child welfare system identify today—cultural bias, lack of parental consent to remove, and lack of investigation and follow-up after placement—were present at its inception.

When child protection went "public," those problems remained and grew deeper. The first formal child protective agency, the New York Society for the Prevention of Cruelty to Children, was established in 1875 after its founders conducted the first court-sanctioned child removal.[257] Within forty years, there were 494 similar societies in the United States that were hailed as the pioneers of the public child welfare system because they increased public awareness of child abuse, lobbied for its criminalization, filed actions in court, and "challenged the autonomy of parents in the interest of child protection to a greater extent than had other organized social agencies."[258]

This history demonstrates that, from its inception, the child welfare system was based on faulty assumptions about what was in a child's best interest. The pioneers of the child welfare system determined that poverty was reason enough to remove a child from her parents. Further, perceptions about a family's background and beliefs and their "otherness" was a possible motivating factor in determining which children should be removed. At that time, it appears that there was no regard for the trauma of separating these children from their families, in part because their families were valued less by society. Two centuries later, such assumptions continue to pervade the child welfare system.

Modern child welfare activists argue that labeling the poor with genetic inferiority has simply been replaced in today's system with a label of psychological inferiority[259] and, given the racial composition of the families involved in the child

---

253. *Id.* at 22.

254. *See* Kristine E. Nelson, *Child Placing in the Nineteenth Century: New York and Iowa*, 59 Soc. Serv. Rev. 107, 108 (1985).

255. *Id.*

256. *See* In re Knowack, 53 N.E. 676, 677 (N.Y. 1899).

257. John E.B. Myers, *A Short History of Child Protection in America*, 42 Fam. L.Q. 449, 449, 451–52 (2008).

258. Lois A. Weithorn, *Protecting Children from Exposure to Domestic Violence: The Use and Abuse of Child Maltreatment Statutes*, 53 Hastings L.J. 1, 50 (2001).

259. Mundorff, *supra* note 78, at 174 ("Slaves were purportedly of an inferior race, while today's underclass is pathologized and given psychological pseudo diagnoses to justify intervention.").

welfare system, arguably one of racial and cultural inferiority as well.[260] Just as Charles Brace believed that a "fresh start" was the only way to save these children,[261] many of today's child welfare professionals still believe that removing Black and Brown children is in their best interest.[262] But, as outlined in Part I, that belief is based on a misunderstanding of harm, and the law must be corrected accordingly.

### *B. The States' Legal Interests in Protecting Children*

Although the government initially was not involved in child welfare, the law evolved to recognize state authority to protect its citizens. This was primarily through the Supreme Court's legal recognition of the state's "police powers" and the application of the doctrine of *parens patriae* to child welfare. In short, "the police power is the state's inherent plenary authority to promote the public health, safety and welfare generally," while the *parens patriae* doctrine "confers state authority to protect or promote a particular child's welfare."[263]

Under their police powers, states promulgate laws to further the state interest in protecting the general population. These include "regulations designed to promote the public convenience[,] . . . the general prosperity, . . . the public health, the public morals, or the public safety."[264] The states' police powers are broad,[265] and one of their traditional uses is the protection of the people's safety.[266]

The clearest application of these two principles in the child welfare context is in *Prince v. Massachusetts* in 1944.[267] In *Prince*, a woman who was a practicing Jehovah's Witness was accused of violating child labor laws by letting a child over whom she had custody sell religious magazines in the street.[268] The Supreme

---

260. *Cf.* Weithorn, *supra* note 258, at 59 ("[T]he nation's web of child protective services agencies has been the target of criticisms . . . for its ignorance of and bias against the cultural traditions of non-white segments of our nation's population and its prejudice against racial and ethnic minorities[.]").

261. MYERS, *supra* note 241, at 21.

262. *See* Asim Cooper, *supra* note 94, at 231 (footnotes omitted) (first citing Elizabeth Bartholet, *The Racial Disproportionality Movement in Child Welfare: False Facts and Dangerous Directions*, 51 ARIZ. L. REV. 871, 874 (2009); and then citing Elizabeth Bartholet, Fred Wulczyn, Richard P. Barth, & Cindy Lederman, *Race and Child Welfare*, CHAPIN HALL ISSUE BRIEF, June 2011, at 1, 2, http://www.law.harvard.edu/faculty/bartholet/RD%20Conference-%20Issue%
20Brief%20-%20Final.pdf [https://perma.cc/T7AM-SCMV]) ("Mere disproportionality of minorities in foster care is not itself evidence of discrimination, they argue, but rather reflects official maltreatment rates. These official maltreatment rates, according to Professor Bartholet, demonstrate 'real differences in the underlying incidence of maltreatment, and that black children are actually at significantly higher risk than white children for serious maltreatment.'").

263. SARAH H. RAMSEY & DOUGLAS E. ABRAMS, CHILDREN AND THE LAW IN A NUTSHELL 10 (2d ed. 2003).

264. Chi., Burlington & Quincy Ry. Co. v Illinois ex rel. Grimwood, 200 U.S. 561, 592 (1906).

265. Wisconsin v. Yoder, 406 U.S. 205, 220 (1972).

266. Queenside Hills Realty Co. v. Saxl, 328 U.S. 80, 82 (1946).

267. Prince v. Massachusetts, 321 U.S. 158 (1944).

268. *Id.* at 161–62. It is worth noting that the woman and child at the center of *Prince v.*

Court, in describing the rationale for upholding the labor laws as a valid state exercise of its police powers, stated that "[i]t is [in] the interest of youth itself, and of the whole community, that children be both safeguarded from abuses and given opportunities for growth into free and independent well-developed men and citizens."[269] Thus, as one commentator summarized, states may intervene to protect children from "poor parenting."[270]

States often employ the doctrine of *parens patriae* to further these police-power objectives in the context of children.[271] Literally, *parens patriae* means "parent of his or her country."[272] Black's Law Dictionary defines *parens patriae* as the right of the government "to prosecute a lawsuit on behalf of a citizen," especially those who are unable to advocate for themselves,[273] such as minors or the disabled.[274]

Thus, while recognizing that parents do enjoy some rights, the *Prince* Court held that:

> [T]he family itself is not beyond regulation in the public interest
> . . . [a]nd . . . rights of parenthood are [not] beyond limitation.
> Acting to guard the general interest in youth's well being, the state
> as parens patriae may restrict the parent's control by requiring
> school attendance, regulating or prohibiting the child's labor, and
> in many other ways.[275]

The Supreme Court has described *parens patriae* as "inherent in the supreme power of every State . . . often necessary to be exercised in the interests of humanity, and for the prevention of injury to those who cannot protect themselves."[276]

---

*Massachusetts* were "others." They were Jehovah's witnesses who were distributing religious literature. In his dissent, Justice Murphy lamented that:

> [T]he Jehovah's Witnesses are living proof of the fact that even in this nation,
> conceived as it was in the ideals of freedom, the right to practice religion in
> unconventional ways is still far from secure. Theirs is a militant and unpopular
> faith, pursued with a fanatical zeal. They have suffered brutal beatings; their
> property has been destroyed; they have been harassed at every turn by the res-
> urrection and enforcement of little used ordinances and statutes.

*Id.* at 176 (Murphy, J., dissenting).

269.  *Id.* at 165.

270.  Deana A. Pollard, *Banning Corporal Punishment: A Constitutional Analysis*, 52 AM. U. L. REV. 447, 457 (2002).

271.  Demosthenes A. Lorandos, *Secrecy and Genetics in Adoption Law and Practice*, 27 LOY. U. CHI. L.J. 277, 311 (1996).

272.  *Parens Patriae*, BLACK'S LAW DICTIONARY (10th ed. 2014).

273.  *Id.*

274.  *See, e.g.*, Lori Joy Eisner, *Casenotes: Constitutional Law—Maryland Circuit Courts Have* Parens Patriae *Jurisdiction to Authorize Guardians to Consent to Sterilization of Incompetent Minors When the Procedure Is Medically Necessary.* Wentzel v. Montgomery General Hospital, Inc., *293 Md. 685, 447 A.2d 1244 (1982)*, 11 U. BALT. L. REV. 467 n.8 (1982) ("[U]nder a *parens patriae* theory . . . the state assumes the common law equity jurisdiction of guardianship over minors and other persons under disability."); Liebmann, *supra* note 14, at 149–50.

275.  Prince v. Massachusetts, 321 U.S. 158, 166 (1944) (footnotes omitted).

276.  Late Corp. of the Church of Jesus Christ of Latter-Day Saints v. United States, 136 U.S.

Thus, with respect to children, *parens patriae* is the constitutional recognition that a child is unable to care for itself and, therefore, when the government believes that a parent fails to provide adequate care, the government may intervene.[277]

## C. Federal Intervention

Although early constitutional law recognized a state's authority to intervene in certain family matters, early federal legislation rarely attempted to use that authority and made efforts to keep families together.

In the 1970s, in response to growing awareness about child abuse and Dr. Henry Kempe's breakthrough article, "The Battered Child Syndrome,"[278] the federal government passed the Child Abuse Prevention and Treatment Act ("CAPTA").[279] Passed in 1974, CAPTA conditioned federal funding for state child welfare programs on implementation of federal anti-abuse policies,[280] but it also allocated substantial funds for family preservation.[281] Shortly thereafter, in 1980, Congress passed the Adoption Assistance and Child Welfare Act ("AACWA"),[282] which required states to make reasonable efforts to prevent removal and, once children were placed into foster case, to make reasonable efforts towards family reunification.[283]

Two decades later, the government implemented the Adoption and Safe Families Act of 1997 ("ASFA").[284] ASFA developed in the wake of the "War on Drugs" when both the foster care population and the prison population were on the rise.[285] The House Committee on Ways and Means reported that there was "a growing belief that Federal statutes, the social work profession, and the courts sometimes err on the side of protecting the rights of parents" to the detriment of

---

1, 57 (1890).

277.  *See* Natalie Loder Clark, *Parens Patriae and a Modest Proposal for the Twenty-First Century: Legal Philosophy and a New Look at Children's Welfare*, 6 MICH. J. GENDER & L. 381, 391 (2000).

278.  Vivek S. Sankaran, *Innovation Held Hostage: Has Federal Intervention Stifled Efforts to Reform the Child Welfare System?*, 41 U. MICH. J.L. REFORM 281, 288 (2007) (citing Henry Kempe, Frederic N. Silverman, Brandt F. Steele, William Droegemueller, & Henry K. Silver, *The Battered Child Syndrome*, 9 CHILD ABUSE & NEGLECT 143 (1985)).

279.  *Id.* (citing Child Abuse Prevention and Treatment Act of 1974, 42 U.S.C. § 5101 (1996)).

280.  *See id.* at 288–89.

281.  *See, e.g.*, Child Welfare Info. Gateway, U.S. Dep't of Health & Human Servs., *Major Federal Legislation Concerned with Child Protection, Child Welfare, and Adoption*, FACTSHEET, Oct. 2003, at 1, 2, 18, https://www.childwelfare.gov/pubPDFs/fedlegis.pdf [https://perma.cc/S68G-AG64]; *Promoting Safe and Stable Families: Title IV-B, Subpart 2, of the Social Security Act*, CHILD. BUREAU (May 17, 2012), https://www.acf.hhs.gov/cb/resource/pssf-title-iv-b-subpart-2-ssa [https://perma.cc/RSB3-WMHZ].

282.  Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 622 (2018).

283.  Child Welfare Info. Gateway, U.S. Dep't of Health & Human Servs., *Reasonable Efforts to Preserve or Reunify Families and Achieve Permanency for Children*, ST. STATUTES, Mar. 2016, at 1, 2 & n.2, https://www.childwelfare.gov/pubPDFs/reunify.pdf [https://perma.cc/WNJ5-V8C9].

284.  Adoption and Safe Families Act of 1997, 42 U.S.C. § 671 (2012).

285.  Allison E. Korn, *Detoxing the Child Welfare System*, 23 VA. J. SOC. POL'Y & L. 293, 308–09 (2016).

their children.[286] Reflecting this concern, ASFA stated that when making decisions about removals, "the child's health and safety shall be the paramount concern."[287] And so, removal rates rose based on a perception of rising "parental drug use that was seen as contributing to social ills, like sexual deviance, crime, and poverty."[288]

ASFA theoretically aims to continue AACWA's goal of strengthening families by requiring that "reasonable efforts shall be made to preserve and reunify families prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home."[289] Federal funds related to removal are conditioned on a judicial finding that the state agency made reasonable efforts to prevent removal and that remaining in the home would be contrary to the welfare of the child.[290] If a state agency fails to make reasonable efforts, it does not receive federal funds while that child is in foster care.[291] Depending on the duration of the child's stay in foster care, a failure to make reasonable efforts could cost the state thousands of dollars.[292]

In practice, however, ASFA's reasonable efforts requirement is toothless; it has made matters worse, not better. In part, this is because ASFA does not define the term "reasonable efforts." Child welfare reformers implored Congress to define reasonable efforts, noting the challenges resulting from the preceding law's failure to define this term.[293] Yet ASFA's only clarification of prior law was to declare that "in making such reasonable efforts, the child's health and safety shall be the paramount concern."[294] This is, of course, no clarification at all.

In addition to its failure to define "reasonable efforts" to prevent removal, ASFA eroded the reasonable efforts requirement of its predecessor by excusing reasonable efforts in certain situations. For example, the child protective agency is exempted from making reasonable efforts if the parent has subjected the child to "aggravated circumstances," committed a serious crime such as sexual abuse or murder of another child of the parent, or if there has been a prior termination of a

---

286.  H. R. REP. No. 105-77, at 8 (1997), *as reprinted in* 1997 U.S.C.C.A.N. 2739, 2740.

287.  42 U.S.C. § 671(a)(15)(A).

288.  Korn, *supra* note 285, at 308.

289.  42 U.S.C. § 671(a)(15)(B)(i).

290.  *See* §§ 671(a)(15)(B)(i), 672(a)(2)(A)(ii); 45 C.F.R. § 1356.21(b)(1) (2012); *see also* Sankaran & Church, *supra* note 177, at 214–15 ("Any order authorizing . . . removal . . . must be based on the court's finding that remaining in the home would be 'contrary to the child's welfare.' Furthermore, absent certain aggravated circumstances, the court must find that the agency has made reasonable efforts to prevent the child's removal to foster care. If a court fails to make either of these findings, the agency cannot receive any federal funds for the entire duration of the child's stay in foster care, a severe penalty that could cost the State thousands of dollars."). While federal law also requires reasonable efforts to be made towards reunification, for the purposes of this paper, "reasonable efforts" refers to reasonable efforts to prevent removals.

291.  Sankaran & Church, *supra* note 177, at 215.

292.  *Id.*

293.  Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation*, 12 B.U. PUB. INT. L.J. 259, 279–80 (2003).

294.  42 U.S.C. § 671(a)(15)(A).

parent's rights with respect to a child's sibling.[295] Not infrequently, then, the agency need not make *any* effort whatsoever to prevent removal and need not be diligent in its inquiry into the facts pertaining to the specific child.[296]

ASFA also fails to specifically define "aggravated circumstances."[297] As a result, individual states are each able to freely define the circumstances that entitle child welfare agencies to deny reunification efforts to biological parents. For example, in states like Alabama, Kentucky, and Ohio, reasonable efforts are not required for parents who misuse substances and either refuse or fail to engage in treatment.[298] "By doing this, ASFA helped to expedite permanency [i.e., freeing children for adoption] and de-emphasize the rights of the biological parents."[299] And the House Committee report on ASFA makes clear that "permanency" was also a motivator driving ASFA, arising out of concerns about the growing number of children who were languishing in foster care[300] due to increased removals.[301] But ASFA's goal of "permanency" was geared towards adoption or other extra-familial placements, not reunification.[302] ASFA therefore marked a discouraging shift away from family reunification and towards adoption.[303]

While some states choose to offer reunification incentives, federal law only contains financial incentives for adoption—not for reunification.[304] Thus, in passing ASFA, the federal government displayed a preference for adoption and therefore designed a system which favors removals, as children must first be taken from their biological families in order for them to be adopted later.

---

295. § 671(a)(15)(D)(i)–(iii).

296. Some states, such as Missouri, have left the agency with the discretion to make reasonable efforts in implementing these exceptions. *See* MO. ANN. STAT. § 211.183(7) (West 2018).

297. § 671(a)(15)(D).

298. ALA. CODE § 12-15-312(c)(1)(b) (West 2019); KY. REV. STAT. ANN. § 610.127(5) (West 2018); *see also* OHIO REV. CODE ANN. § 2151.419(A)(2)(c) (West 2018) (must have put the child in danger due to drug use); *cf.* CAL. WELF. & INST. CODE § 361.5(b)(13) (West 2018) (reunification discretionary in these circumstances).

299. LESLEY J. KARNES, THE ADOPTION AND SAFE FAMILIES ACT OF 1997: A POLICY ANALYSIS 56 (2015), https://pqdtopen.proquest.com/doc/1687757557.html?FMT=AI [https://perma.cc/3LHH-87GX].

300. *See* H.R. REP. No. 105-77, at 8–9 (1997), *as reprinted in* 1997 U.S.C.C.A.N. 2739, 2741 ("[A]nother barrier to adoption has been that States often move slowly in moving children toward permanent settings. . . . Thus, a second provision of the Committee bill would promote adoption by requiring States to initiate action to terminate parental rights in the case of children under age 10 who have been in foster care for 18 of the past 24 months. This provision would move States toward establishing timeframes and deadlines in their attempts to provide reasonable help to families.").

301. ROBERTS, *supra* note 97, at 104–13, *reprinted in* Dorothy Roberts, *ASFA: An Assault on Family Preservation*, PBS THIRTEEN: FRONTLINE (2003), https://www.pbs.org/wgbh/pages/frontline/shows/fostercare/inside/roberts.html [https://perma.cc/V8HJ-EUTE].

302. *See id.*

303. *See* Cristine H. Kim, *Putting Reason Back into the Reasonable Efforts Requirement in Child Abuse and Neglect Cases*, 1999 U. ILL. L. REV. 287, 309.

304. *See* EMILIE STOLTZFUS, CONG. RESEARCH SERV., R43025, CHILD WELFARE: STRUCTURE AND FUNDING OF THE ADOPTION INCENTIVES PROGRAM ALONG WITH REAUTHORIZATION ISSUES (2013).

Even if we judge ASFA by its stated goal of achieving permanency for foster children, it has largely failed.[305] In 2016, nearly twenty years after ASFA was passed, 117,794 children were awaiting adoption.[306] Of those, more than half—65,274[307]—were "legal orphans," meaning that their parents' rights had been terminated but they were still awaiting adoption.[308] Further, of these 117,794 children, only around thirteen percent (14,765) were in pre-adoptive homes.[309] Thus, current federal law continues to inflict the harms of foster care on children with little hope of being reunited with their parents. But the sad fact is that the majority of these children will not be adopted either.

### D. How Removals Are Conducted Without Consideration of Harm of Removal

With this legal backdrop in mind, it is useful to understand how the law is effected in practice across the country: most states remove children without requiring consideration of the extensive harms—like those discussed above[310]—these removals are causing.

When the state receives a report of child abuse or neglect, it assigns a caseworker to conduct an investigation.[311] If the caseworker determines that the child should be removed, parents are generally entitled to a hearing.[312] Most states have two sets of statutes that govern those hearings: "removal statutes" and "reasonable efforts statutes." Thus, there are (at least) two relevant judicial questions as a court determines whether to remove a child from her parent: 1) is there sufficient risk of harm to remove the child?; and 2) did the state make reasonable efforts to prevent removal?[313]

The majority of jurisdictions *do not* require that courts consider the harm of removal when answering those questions.

In some states' statutory schemes, such evidence could be introduced, though the court is under no obligation to consider it. For example, some states determine

---

305. Wexler, *supra* note 14, at 144–45.

306. CHILDREN'S BUREAU, U.S. DEP'T OF HEALTH & HUMAN SERVS., THE [2016] AFCARS REPORT 20 (2017), https://www.acf.hhs.gov/sites/default/files/cb/afcarsreport24.pdf [https://perma.cc/T24N-RVF4].

307. *Id.*

308. *See, e.g.*, Martin Guggenheim, *The Effects of Recent Trends to Accelerate the Termination of Parental Rights of Children in Foster Care—An Empirical Analysis in Two States*, 29 FAM. L.Q. 121, 134 (1995).

309. CHILDREN'S BUREAU, U.S. DEP'T OF HEALTH & HUMAN SERVS., *supra* note 306, at 20, 50.

310. *See supra* Part II.

311. Amy Mulzer & Tara Urs, *However Kindly Intentioned: Structural Racism and Volunteer Casa Programs*, 20 CUNY L. REV. 23, 30 (2016).

312. *Id.* at 30–31.

313. For example, in New York, a removal order must state "the court's findings which support the necessity of such removal." N.Y. FAM. CT. ACT § 1027(b)(ii) (McKinney 2018). The order must also state "whether reasonable efforts were made prior to the date of the hearing . . . to prevent or eliminate the need for removal of the child from the home." *Id.*

whether removal would be in the best interests of the child.[314] Others also contemplate whether continued placement in the child's home is contrary to the child's welfare.[315] Statutes in other states provide that a parent may "introduce evidence, call witnesses, be heard on their own behalf, and cross-examine witnesses called by the state."[316] A parent from any of these states may be able to introduce harm-of-removal evidence, although it is unclear if such information would be considered relevant. In these jurisdictions, harm of removal arguments could be appropriate, but there is no guarantee that they will be given adequate weight by the court.

For other states, the problem is instead a temporal one. Alaska explicitly requires a consideration of the harm of removal in the ultimate adjudication of whether a child needs state assistance.[317] However, such a hearing is only required within 120 days.[318] Therefore, a child could be in foster care for months before the judge is required to consider the harm of removal. So, while Alaska's law at least recognizes that these harms should be considered, it does so too late in the process.

Similarly, some states, like Maryland, require or allow a hearing *after* the child is placed in shelter care to determine whether it is contrary to the welfare of the child to return home.[319] Even if a parent were to prevail at such a hearing, the trauma of the removal process itself has already been inflicted regardless of how long the removal lasted.

Other states, like Arkansas, require courts to "order family services appropriate to prevent removal unless the health and safety of the juvenile warrant immediate removal for the protection of the juvenile."[320] This is a clearer directive that reasonable efforts must be made prior to removal because it explicitly requires services be put into place to avoid the need for removal if possible.

Colorado requires the state to advise the parent that a "child may risk lifelong damage to his or her emotional well-being if the child becomes attached to one caregiver and is later removed from the caregiver's home."[321] Presumably, this is meant to force a parent to consider whether reunification will be difficult for the child (if the child has become attached to the person with whom the child was placed) before pressing for reunification. This demonstrates the blind spot so

---

314. *E.g.*, Ark. Code Ann. § 9-27-102 (West 2019); Kan. Stat. Ann. § 38-2255(c)(1)(C) (West 2019); *cf.* Del. Fam. Ct. R. Civ. P. 214(b)(2) (hearing for continued state custody after initial removal).

315. *E.g.*, Ga. Code Ann. § 15-11-202(j)(1) (West 2019); Kan. Stat. Ann. § 38-2243(c)(1)(B); Me. Stat. tit. 22, § 4036-B(2) (2019); N.H. Rev. Stat. Ann. § 169-D:10-b(I) (2019); Tex. Fam. Code Ann. § 262.101(2) (West 2019).

316. *E.g.*, La. Child. Code Ann. art. 624 (2018).

317. *See* Alaska Stat. Ann. § 47.10.080(a) (West 2018).

318. *Id.*

319. *E.g.*, Md. Code Ann., Cts. & Jud. Proc. § 3-815(b)(3)(i)(1), (d)(1) (West 2018).

320. *E.g.*, Ark. Code Ann. § 9-27-328(a) (West 2018).

321. Colo. Rev. Stat. Ann. §19-3-403(3.6)(a)(I)(E) (West 2018).

many states have toward the harm of choosing to first remove a child: on the one hand, the law may contemplate the *general* harm associated with removal; on the other hand, it incorporates no reference to the specific harm caused by removal *from the child's parents*. Instead, it only considers the harm that might be later caused by removing a child from a temporary custodian, such as a foster parent or kinship resource.

On the whole, the problem with statutes that allow for contemplation of the harm of removal is that even if lawyers make these arguments, judges are not required to take the information into account. And even if judges were required to or even elected to consider such factors, no statutory guidance exists for weighing this evidence against any perceived risk of harm in keeping the child at home. Hence, a judge could easily find that moving to a foster home in a better neighborhood with wealthier foster parents is in a child's best interest, even if significant harm-of-removal evidence is adduced. As a result, one could argue that these vague statutes leave even greater room for flawed, subjective notions of what is "best" for a child. And at the very least, they create unnecessary uncertainty for parents, children, judges, and practitioners.

### E. Reasonable Efforts Statutes That Do Not Incorporate the Harm of Removal

Since federal funding is conditioned on enactment of provisions set out by ASFA,[322] all fifty states have enacted "reasonable efforts" legislation to comply with ASFA and ensure their access to federal funds.[323]

In promulgating these statutes, however, most states adopted ASFA's language verbatim. Thus, despite the confusion caused by the undefined federal "reasonable efforts" standard, most states did nothing to clarify what the law requires.[324] As a result, in most states, individual agencies, and caseworkers are left to decide what efforts to make in each case.[325] Courts also have no guidance in measuring what criteria should be weighed to determine whether the state agency made reasonable efforts to prevent removal.[326]

---

322. 42 U.S.C. § 679b(a)(4) (requiring regulations to evaluate state performance of ASFA's requirements as a condition of continued funding); *see also* Katherine A. Hort, *Is Twenty-Two Months Beyond the Best Interest of the Child? ASFA's Guidelines for the Termination of Parental Rights*, 28 FORDHAM URB. L.J. 1879, 1898 (2001).

323. *See* Hort, *supra* note 322, at 1886.

324. Crossley, *supra* note 293, at 282, 293 ("[T]he original conception of the reasonable efforts provision as Congress introduced it in the Child Welfare Act is commonplace among state statutes.").

325. *See, e.g., id.* at 295–97 (offering examples of the varying degrees of "reasonable efforts"—such as acting with "due diligence" and providing "appropriate services"—and the lack of clarity provided to state agencies); Alice C. Shotton, *Making Reasonable Efforts in Child Abuse and Neglect Cases: Ten Years Later*, 26 CAL. W. L. REV. 223, 241 (1990) ("Many child welfare workers want to know what their duty under the reasonable efforts requirement is[.]").

326. *See, e.g.*, Crossley, *supra* note 293, at 285–86; Shotton, *supra* note 325, at 227.

IV.

HOW THE LAW CAN HELP CHILDREN

*A. The Right to Family Integrity*

Thus far, the article has described how (1) removal causes harm to children, and (2) how, for the most part, the law does not incorporate that harm into removal decisions. From this point forward, the article will discuss how the law—as made by lawyers, lawmakers, and judges—can fill this glaring gap.

First, we must recognize and emphasize that the law *already* contemplates a right to family integrity. The right to family integrity is an outgrowth of the fundamental constitutional liberty interest of parents to raise their children.[327] More recently, the law has come to encompass the notion that families have a right to stay together.[328]

While the right to family integrity was initially framed as belonging to the parents, Supreme Court jurisprudence suggests this right belongs to children, too.[329] In *Santosky v. Kramer*, the earliest expansion of the right to family integrity, the Court noted that, until a finding of unfitness, parents and children share an interest in preventing termination of their relationship.[330] In so doing, scholars argue that the Court demonstrated that this right was "reciprocal, running both from the child to the parent and the parent to the child . . . suggest[ing] that either party could invoke the right, not just the parent."[331] While the question of whether children possess this fundamental right is an open one and has never been squarely answered by the Supreme Court,[332] at least four federal circuits and several lower courts have held that this right belongs to both parents and children.[333]

---

327. *See* Meyer v. Nebraska, 262 U.S. 390, 399 (1923) (holding that parents have a fundamental right to direct upbringing of their children by controlling their education).

328. Santosky v. Kramer, 455 U.S. 745, 753–54 (1982); Stanley v. Illinois, 405 U.S. 645, 651 (1972) (citations omitted) (first citing *Meyer*, 262 U.S. at 399; then citing Skinner v. Oklahoma, 316 U.S. 535, 541 (1942); and then citing Griswold v. Connecticut, 381 U.S. 479, 496 (1965) (Goldberg, J., concurring)) ("The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment.").

329. Lawrence G. Albrecht, *Human Rights Paradigms for Remedying Governmental Child Abuse*, 40 WASHBURN L.J. 447, 448 (2001).

330. *Santosky*, 455 U.S. at 760.

331. Kevin B. Frankel, *The Fourteenth Amendment Due Process Right to Family Integrity Applied to Custody Cases Involving Extended Family Members*, 40 COLUM. J.L. & SOC. PROBS. 301, 319 (2007).

332. Stratton v. Mecklenburg Cty. Dep't of Soc. Servs., 521 F. App'x 278, 295 (4th Cir. 2013).

333. The Second Circuit has stated in dicta that the right to the preservation of family integrity encompasses the reciprocal rights of both parents and children. Duchesne v. Sugarman, 566 F.2d 817, 825 (2d Cir. 1977). The Fifth Circuit has cited *Duchesne* for this proposition, noting that the right of the family to remain together "without the coercive interference of the awesome power of the state" is the "most essential and basic aspect of familial privacy." Hodorowski v. Ray, 844 F.2d 1210, 1216 (5th Cir. 1988) (quoting *Duchesne*, 566 F.2d at 825). The Seventh Circuit has also noted that several courts have held that just as "[p]arents have a fundamental due process right to care for and raise their children, . . . children enjoy the corresponding familial right to be raised and nurtured

Children, therefore, arguably have an independent right to remain a part of their family. And, at the very least, parents have a clear right to remain with their children until a finding of unfitness.

In analyzing these fundamental rights, scholars have outlined the following rationale for constitutional protection of the family unit:

> First, history and tradition support the designation of this fundamental freedom. Second, the government relies on the family to socialize children as well as to instill moral and cultural values. Third, family autonomy facilitates pluralism and diversity which might not be preserved if the government controlled childrearing. Finally, protection of family relations is often important to the physical and emotional development of the child.[334]

Scholars have also argued that recognition of the right to family integrity developed in response to the destruction of Black families during slavery, and that it was necessary because "the destruction of the family was seen as a powerful vehicle of subjugation and dehumanization that could be inflicted on minority groups."[335]

The rationales supporting these constitutional principles demonstrate a direct recognition of the harms inflicted on a child once separated from her parents. They acknowledge the fact that parents and children have a shared right to remain together as a family,[336] and that separating families also destroys communities.

Following from these principles, when the state believes it is necessary to intervene in family relations, "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State."[337] In other words, the state's involvement must be narrowly tailored to achieve the compelling interest in protecting children while not infringing on the family's fundamental liberty interests.

---

by their parents." Berman v. Young, 291 F.3d 976, 983 (7th Cir. 2002). Additionally, the Ninth Circuit has explicitly held that "[t]he companionship and nurturing interests of parent and child in maintaining a tight familial bond are reciprocal, and we see no reason to accord less constitutional value to the child-parent relationship than we accord to the parent-child relationship. Smith v. City of Fontana, 818 F.2d 1411, 1418 (9th Cir. 1987), *overruled on other grounds by* Hodgers–Durgin v. de la Vina, 199 F.3d 1037 (9th Cir. 1999) (en banc). Several lower courts have also cited *Duchesne* for the larger idea that the right to family integrity is reciprocal. *See, e.g.*, Loftus v. Clark-Moore, No. 09-14019-CIV, 2009 WL 1956319, at *5 (S.D. Fla. July 7, 2009), *aff'd*, 690 F.3d 1200 (11th Cir. 2012); In re Terry D., 148 Cal. Rptr. 221, 226 (Ct. App. 1978).

334. Daan Braveman & Sarah Ramsey, *When Welfare Ends: Removing Children from the Home for Poverty Alone*, 70 TEMP. L. REV. 447, 450–51 (1997) (footnotes omitted).

335. Caitlin Mitchell, *Family Integrity and Incarcerated Parents: Bridging the Divide*, 24 YALE J.L. & FEMINISM 175, 181 (2012).

336. Pamela Dru Sutton, *The Fundamental Right to Family Integrity and Its Role in New York Foster Care Adjudication*, 44 BROOK. L. REV. 63, 63 (1977).

337. Santosky v. Kramer, 455 U.S. 745, 753–54 (1982).

Even if a child welfare case is opened, the presumption of a shared interest between child and parent persists unless and until a judicial finding of unfitness is made. The Supreme Court has held that "[t]here is a presumption that fit parents act in their children's best interests; there is normally no reason for the State to inject itself into the private realm of the family to further question fit parents' ability to make the best decisions regarding their children."[338] Once a court makes a finding of unfitness, however, the state's own compelling interest in protecting its citizens permits it to overcome the family's constitutional interests and intervene.[339]

In sum, in considering the removal of a child, it is important to remember that the constitutional rights of parents and potentially all family members are implicated. In making the decision to remove a child, the right to family integrity must be balanced carefully against state interests. The Constitution arguably requires consideration of the harm of removal as a part of such balancing, because there is a fundamental liberty interest in the family unit and the bonds within it, and any state interference causing the traumatic destruction of these bonds requires heightened scrutiny.

*B. New Federal Law*

New federal law may also help point the way forward. In February 2018, the federal government passed the Family First Prevention Services Act of 2017 ("FFPSA").[340] The FFPSA aims to "provide enhanced support to children and families and prevent foster care placements through the provision of mental health and substance abuse prevention and treatment services, in-home parent skill-based programs, and kinship navigator services."[341] Eligible families can receive services for up to a year if a child is deemed to be at imminent risk of going into foster care but could remain safely at home or in a kinship placement if services are provided.[342]

Proponents of the bill demonstrate a growing concern about the harms of removal. United States House of Representatives Ways and Means Committee Chairman Kevin Brady noted that the bill was driven largely by the nationwide opioid crisis that is "tearing families across the country apart."[343] Perhaps learning from ASFA's mistakes, Brady noted that the bill "puts families first" and supports

---

338.  Troxel v. Granville, 530 U.S. 57, 58 (2000) (citation omitted).

339.  *See* Stanley v. Illinois, 405 U.S. 645, 649 (1972).

340.  Family First Prevention Services Act of 2017, Bipartisan Budget Act of 2018, Pub. L. No. 115-123, 132 Stat. 64, 232–69 (2018) (codified as amended in scattered sections of 42 U.S.C.).

341.  *Id.* at 232.

342.  *Id.* at 233.

343.  Press Release, U.S. House of Representatives Comm. on Ways & Means, Bipartisan House, Senate Leaders Announce Proposed Child Welfare Legislation (June 10, 2016) [hereinafter Ways & Means], https://waysandmeans.house.gov/bipartisan-house-senate-leaders-announce-proposed-child-welfare-legislation/ [https://perma.cc/Y7U9-3KBQ].

parents rather than immediately sending children into the foster care system.[344] Ranking U.S. House of Representatives Member Sander Levin stated that the bill would expand "critical prevention services that would keep kids safe and at home."[345] And the bill sponsor, Ways and Means Human Resources Subcommittee Chairman Vern Buchanan, issued a press statement noting that foster children have higher rates of "substance abuse, homelessness, and teen pregnancy."[346] The same press release states boldly at the top, "Breaking Up Families Should be a Last Resort."[347] Thus, this new law appears to be the beginning of a shift away from ASFA back towards family preservation and reunification.

### C. Helpful State Statutes Regarding Reasonable Efforts to Prevent Removal

A few states have attempted to provide more guidance than the federal language, but only New Mexico identifies the harm of removal as a specific factor in the reasonable efforts inquiry. New Mexico's reasonable efforts statute states that a predisposition study shall include:

> [A] statement of how an intervention plan is designed to achieve placement of the child in the least restrictive setting available, consistent with the best interests and special needs of the child, including a statement of the likely harm the child may suffer as a result of being removed from the parent's home, including emotional harm that may result due to separation from the child's parents, and a statement of how the intervention plan is designed to place the child in close proximity to the parent's home without causing harm to the child due to separation from parents, siblings or any other person who may significantly affect the child's best interest.[348]

Interestingly, New Mexico's removal statute[349] (as opposed to its reasonable efforts statute above[350]) does not explicitly require consideration of the harm of removal. Therefore, a court must take harm of removal into account in determining whether reasonable efforts were made to prevent removal, but not in the context of the larger question of whether the child ultimately should be removed. Thus, New Mexico only gets it half right.

---

344. *Id.*

345. *Id.*

346. Press Release, Vern Buchanan, Representative, U.S. House of Representatives, Buchanan Introduces Bill to Help Children & Fix Foster Care (Jan. 6, 2017), https://buchanan.house.gov/media-center/press-releases/buchanan-introduces-bill-help-children-fix-foster-care [https://perma.cc/YG6H-QRBY]; Ways & Means, *supra* note 343.

347. *Id.*

348. N.M. STAT. ANN. § 32A-4-21(B)(2) (West 2018).

349. § 32A-3B-3.

350. § 32A-4-21.

Finally, although they do not specifically discuss the harm of removal, some states such as Hawaii have detailed language that acts as a helpful guide for agencies to prevent removal. Hawaii's Child Protective Act requires that the service plan be crafted with the family and that "[e]very reasonable opportunity should be provided to help the child's legal custodian to succeed in remedying the problems that put the child at substantial risk of being harmed."[351] Minnesota and South Carolina list criteria to ascertain whether reasonable efforts are made by determining, for example, whether the services were available, adequate to address the family's needs, and "realistic under the circumstances."[352] Nebraska requires that "reasonable efforts" be made in the "least intrusive and least restrictive method consistent with the needs of the child" and "as close to the home community of the child or family requiring assistance as possible."[353]

Thus, although not ideal, these state statutes provide some room for advocates to make arguments related to the harm of removal, and for courts to consider them.

### D. Jurisdictions That Get It Right

New York and the District of Columbia are the only jurisdictions[354] that *overtly require* government officials to consider the harm of removal in their substantive removal statutes, though in different ways. The District of Columbia affirmatively requires such consideration in its substantive removal statute.[355] New York has interpreted the existing removal statute to graft the requirement into the law via caselaw.[356]

While this does not always translate into perfect results in practice, these jurisdictions do provide models for how harm-of-removal evidence can become part of the equation in child welfare actions. Between 2007 and 2016, New York and the District of Columbia showed some of the largest proportional decreases of children entering foster care in the country.[357] Thus, the evidence, though inconclusive, suggests that these two routes for considering the harms of removal may be working and resulting in fewer children suffering the traumatic effects of family separation.

---

351. HAW. REV. STAT. ANN. § 587A-2 (West 2018).

352. MINN. STAT. ANN. § 260.012(h) (West 2018); S.C. CODE ANN. § 63-7-720(A)(6) (2019).

353. NEB. REV. STAT. ANN. § 43-532(2) (West 2018).

354. While as noted, Alaska also contemplates the harm of removal, the law requires this consideration too late in the process. *See supra* text accompanying notes 317–18. Thus, Alaska does not "get it right."

355. D.C. CODE ANN. § 16-2310(b)(3) (West 2019).

356. *See* Nicholson v. Scoppetta, 820 N.E.2d 840, 852 (N.Y. 2004).

357. CHILDREN'S BUREAU, U.S. DEP'T OF HEALTH & HUMAN SERVS., ADOPTION AND FOSTER CARE ANALYSIS AND REPORTING SYSTEM (AFCARS): NUMBERS OF CHILDREN ENTERING FOSTER CARE, BY STATE (2017), https://www.acf.hhs.gov/sites/default/files/cb/afcars_state_data_tables_07thru16.xlsx [https://perma.cc/V2WQ-ZAQ4].

*1. The District of Columbia*

Washington D.C. is the only jurisdiction that statutorily mandates consideration of the harm of removal. Under D.C. Code section 16-2310, a child may not be placed in foster care[358] prior to a fact-finding[359] or dispositional[360] hearing unless it is necessary to protect that child; no other parent, guardian, or custodian is able to care for her (and the child cannot care for herself); and there are no alternative resources or arrangements available to the family that would protect the child without requiring removal.[361] The criteria for foster care are implemented by the rules of the Superior Court, which govern determination of whether foster care is warranted prior to fact-finding.[362]

In considering whether removal is necessary, under D.C. Code section 16-2312, the family court must determine whether: "(A) [r]easonable efforts were made to prevent or eliminate the need for removal, or, in the alternative, . . . removal from the home is necessary regardless of any services that could be provided . . . ; and (B) [c]ontinuation . . . in the child's home would be contrary to the welfare of the child."[363] This general welfare language is similar to that found in several of the states discussed above.[364]

But Washington D.C. goes a step further and statutorily obligates the judicial officer to evaluate the harm that removal might cause when determining whether a child should be removed from her parents before fact-finding and ultimate disposition. Under the Superior Court rules governing removal[365]:

---

358.  In Washington D.C., foster care is referred to as "shelter care." *See* § 16-2301(14); Casey Family Programs, Jurisdictional Scan: Strong Families 1–2 (2018), https://caseyfamilyprowpengine.netdna-ssl.com/media/SF_First-placement-family-placement.pdf [https://perma.cc/53LB-8KQ8]. The two terms can be used interchangeably. *See, e.g.*, Casey Family Programs, *supra*, at 1–2. Washington D.C., among other jurisdictions, made initial placements in congregate care, such as crisis nurseries or emergency shelters. *See id.* D.C. has since disbanded and replaced these initial group placements with family-first placements in order to reduce trauma for the child. *See id.* However, the D.C. Code still utilizes the term "shelter care" and defines the term as "the temporary care of a child in physically unrestricting facilities, designated by the Division, pending a final disposition of a petition." § 16-2301(14).

359.  Fact-finding generally is a hearing on the ultimate issue of whether the child was abused or neglected. *See* § 16-2301(16) (defining "fact-finding hearing" as "a hearing to determine whether the allegations of a petition are true.").

360.  A dispositional hearing occurs after a finding of neglect or abuse is made. *See* § 16-2301(17) (defining "dispositional hearing" as "a hearing, after a finding of fact, to determine . . . what order of disposition should be made in a neglect case."). At this point, the court can order the children to be placed into shelter care and may order the parents to engage in services to rectify the situation that caused the child to be removed initially. *See id.*

361.  § 16-2310(b).

362.  § 16-2310(c).

363.  § 16-2312(d)(3).

364.  *See* discussion *supra* Section III.D.

365.  These rules states that "[w]hen the Corporation Counsel moves the Court to place a child in shelter care, the government shall have the burden of showing that shelter care is required under the criteria set forth in D.C. Code § 16-2310." D.C. Super. Ct. R. Neglect & Abuse Proc. 13(a). These rules serve as further guidance for the judicial officer in determining whether to place a child

> In making a shelter care determination, the judicial officer shall
> evaluate the harm to the child that may result from removal. In
> making such evaluation, the judicial officer shall consider such
> factors as: (1) The child's attitude toward removal and ties to the
> parent, guardian or custodian, as well as the child's relationships
> with other members of the household; (2) The disruption to the
> child's schooling and social relationships which may result from
> placement out of the neighborhood; and (3) Any measures which
> can be taken to alleviate such disruption.[366]

Even after a parent is deemed neglectful, and if removal is recommended, Washington D.C. requires that the pre-disposition report provided to the judge include information regarding "the likely harm the child will suffer as a result of the separation from his or her parent, guardian, or custodian and recommended steps to be taken to minimize this harm."[367] Thus, this information about the harm of removal will be presented to the court before the court determines whether to order the child's placement into foster care.

Washington D.C.'s statutory framework requires courts to consider all the crucial facts regarding familial bonds and community attachments that may be ignored in other states. Washington D.C. can therefore serve as a model for state legislators across the country.

### 2. New York

In New York, temporary removals are effectuated under Family Court Act Sections 1027 and 1028. Section 1027 applies if a state is seeking to remove a child for the first time while section 1028 is invoked if a child has already been removed and the parents are seeking her return.[368] Both statutes require a court to determine whether removal or continuing the removal of a child is necessary to avoid "imminent risk to the child's life or health" and to "consider and determine in its order whether continuation in the child's home would be contrary to the best interests of the child and where appropriate, whether reasonable efforts were made . . . to prevent or eliminate the need for removal . . .[or] to make it possible for the child to safely return home."[369]

While not explicitly required by these statutes, the Court of Appeals in *Nicholson v. Scoppetta* interpreted this language to require a balancing test, stating:

> The plain language of [Section 1027] and the legislative history
> supporting it establish that a blanket presumption favoring re-
> moval was never intended. The court *must do more* than identify

---

in foster care. *See id.* 13(b)-(e).
   366.  *Id.* 13(e).
   367.  D.C. CODE ANN. § 16-2319(c)(2)(C).
   368.  N.Y. FAM. CT. ACT §§ 1027–1028 (McKinney 2018).
   369.  §§ 1027(b)(i)–(ii), 1028(a)–(b).

the existence of a risk of serious harm. Rather, a court must weigh, in the factual setting before it, whether the imminent risk to the child can be mitigated by reasonable efforts to avoid removal. It must balance that risk against the harm removal might bring, and it must determine factually which course is in the child's best interests.[370]

In practice, this boils down to a three-part test: (1) is there imminent risk of harm if the child remains home; (2) can the risk be mitigated by putting services into place or issuing orders against the parent; and (3) does the harm of removal outweigh any imminent risk?[371] Recent cases in New York illuminate how the harm of removal can be used in judicial determinations. In *In re Rihana J.H.*, described in the introduction,[372] ACS was unwilling to return Rihana to her mother, despite the mother's "high degree of cooperation with ACS," compliance with prior court orders, engagement in all recommended services, and positive court-ordered mental health evaluation, not to mention that the child wanted to return to her mother.[373] The ACS caseworker testified that the younger child's injury was the only reason ACS was not returning Rihana to her mother.[374] As a result, the mother's attorney asked for a hearing on the issue of whether Rihana could go home.[375]

Ultimately, the court found that it did not need to resolve the issue of how Kaden's injury occurred to determine whether Rihana could reunify with her mother.[376] The court analyzed this case under *Nicholson* and noted that it must balance any risk of harm if Rihana was returned to her mother against the emotional and mental harm of her continued removal.[377] In so doing, the court issued orders to mitigate any perceived risk and found that Rihana could safely return to her mother.[378]

In *In re Samuel W.*, another New York family court case, the court reached a similar result where three people—father, mother, and caretaker—were charged with neglect resulting in an unexplained fracture to the child's leg.[379] The mother

---

370. Nicholson v. Scoppetta, 820 N.E.2d 840, 849, 852 (N.Y. 2004).

371. *See, e.g.*, In re Sara A., 35 N.Y.S.3d 450, 452 (N.Y. App. Div. 2016); In re Jesse J. v. Joann K., 882 N.Y.S.2d 487, 489 (N.Y. App. Div. 2009); In re Amanda Lynn B., 877 N.Y.S.2d 104, 105–06 (N.Y. App. Div. 2009); In re David G., 909 N.Y.S.2d 891, 896 (N.Y. Fam. Ct. 2010).

372. *See supra* text accompanying notes 1–9.

373. In re Rihana J.H., No. NA-XXXX-16, 2017 WL 890526, at *4–6 (N.Y. Fam. Ct. Feb. 23, 2017).

374. *Id.* at *4.

375. *Id.* at *1.

376. *Id.* at *4.

377. *Id.* at *6 (quoting Nicholson, 820 N.E.2d at 378–79).

378. *Id.* at *5–7.

379. In re Samuel W., No. NA09331/14, 2015 WL 5311117, at *1 (N.Y. Fam. Ct. Sept. 2, 2015).

had been highly cooperative, was engaged in services, and was receiving unsuper-
vised visits.[380] Yet ACS would not agree to return the child, and he was about to
be moved to his sixth foster home.[381]

The mother's attorney filed a motion to modify the order continuing the
child's placement in foster care.[382] In conducting the *Nicholson* analysis, the court
took note of the fact that Samuel's therapist felt that multiple foster care place-
ments had caused "clear, harmful effects" on Samuel which caused him to become
vulnerable, resulting in displays of "fear, sadness, and confusion about the sudden
and pervasive changes in his routines and relationships."[383] However, the court
continued on to note that since Samuel had been allowed overnight visits with his
mother, there had been a "distinct and positive shift in Samuel's demeanor."[384]
The judge sent the child home to his mother due to the harm caused by the re-
moval.[385]

Where legislatures are slow to act, New York's judicial approach to consid-
ering the harm of removal through practitioner advocacy and judicial intervention
is a model worth emulating.

## V.

### RECOMMENDATIONS

Numerous scholars have suggested different modes of thinking about how the
child welfare system might be overhauled and improved.[386] Others believe that
continuing to err on the side of removal is the safest approach and necessary to
protect children.[387] Nicholas Scoppetta, the first Commissioner of New York
City's Administration for Children's Services, said in his first mission statement
that "[a]ny ambiguity regarding the safety of the child will be resolved in favor of
removing the child[.] . . . Only when families demonstrate to the satisfaction of
ACS that their homes are safe and secure, will the children be permitted to remain

---

380. *Id.* at *1–2.
381. *Id.* at *1.
382. *Id.*
383. *Id.* at *2.
384. *Id.*
385. *Id.* at *1–2.
386. *See, e.g.*, Marcia Lowry, *Foster Care & Adoption Reform Legislation: Implementing the
Adoption and Safe Families Act of 1997*, 14 ST. JOHN'S J. LEGAL COMMENT. 447, 453 (2000) (advo-
cating for more specific plans for getting children adopted after termination of parental rights); Dor-
othy E. Roberts, *Prison, Foster Care, and the Systemic Punishment of Black Mothers*, 59 UCLA L.
REV. 1474, 1500 (2012) (identifying a "need for cross-movement strategies that can address multiple
forms of systemic injustice to contest the overpolicing of women of color and expose how it props
up an unjust social order" leading to unnecessary foster care interventions); Martin Guggenheim,
*The Foster Care Dilemma and What to Do About It: Is the Problem That Too Many Children Are
Not Being Adopted out of Foster Care or That Too Many Children Are Entering Foster Care?*, 2 U.
PA. J. CONST. L. 141, 148–49 (1999) (urging consideration of the fact that there are "anterior prob-
lems surrounding the administration of foster care policy").
387. *See, e.g.*, BARTHOLET, *supra* note 97, at 6; James G. Dwyer, *A Child-Centered Approach
to Parentage Law*, 14 WM. & MARY BILL RTS. J. 843, 855 (2006)

[in] or be returned to the home."[388] The research is clear, however, that the trauma of removal and resulting placement in foster care has long-term and far-reaching negative consequences for children. Thus, reforms that specifically incorporate consideration of the harm of removal are necessary to ensure that our system recognizes these detrimental effects, because these reforms would ultimately reduce harm to children, which should be everyone's goal.

While substantial changes to existing law would provide greater impact, many reforms could easily be implemented within the existing child welfare framework.

### A. Federal Consideration of Harm of Removal

A number of steps can be taken at the federal level. As discussed earlier, the FFPSA is a step in the right direction towards preserving families.[389] Providing services to those families whose children are at the highest risk of being removed is a logical allocation of resources that will hopefully prevent unnecessary removals. Further, the law authorizes an additional fifteen months of services for families once children return home.[390] This will allow families access to continued support once children are back in their care to help prevent further disruptions.

Further, the FFPSA allows states to provide preventative services to a greater range of families, not just the indigent.[391] As a result, more families who needed the services but did not qualify because there have been no recent adjustments to income standards will now be able to access them.[392]

It remains to be seen how the Act will work in practice, however, as rulemaking began in October of 2018 and the funding does not become available until October of 2019.[393] Relevant agencies should ensure that the broad principles outlined in the bill and by the sponsors are carried out and funded appropriately.

---

388. NINA BERNSTEIN, THE LOST CHILDREN OF *WILDER*: THE EPIC STRUGGLE TO CHANGE FOSTER CARE 435, 437 (2001).

389. *See* discussion *supra* Section IV.B.

390. Family First Prevention Services Act of 2017, Bipartisan Budget Act of 2018, Pub. L. No. 115-123, § 50721(a)(2)(C), 132 Stat. 64, 245 (2018) (codified as amended at 42 U.S.C. § 629a(a)(7)(A)).

391. Teresa Wiltz, *This New Federal Law Will Change Foster Care as We Know It*, PEW CHARITABLE TR. (May 2, 2018), http://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2018/05/02/this-new-federal-law-will-change-foster-care-as-we-know-it [https://perma.cc/Q2W2-USW9] ("In another first, the law also removes the requirement that states only use prevention services for extremely poor families. Because the income standards hadn't been adjusted in 20 years, fewer and fewer families qualified for the services, advocates say. Now, states don't have to prove that an at-risk family meets those circa 1996 income standards. 'That's significant . . . [b]ecause abuse happens in rich homes, middle-class homes, [and] poor homes.'").

392. *Id.*

393. Bipartisan Budget Act of 2018, § 50711(c)(2) (codified as amended at 42 U.S.C. § 674(a)); CHILDREN'S DEF. FUND, FAMILY FIRST PREVENTION SERVICES ACT: IMPLEMENTATION TIMELINE 3 (2018), https://www.childrensdefense.org/wp-content/uploads/2018/08/ffpsa-implementation.pdf [https://perma.cc/5F36-2H4A].

Further, in continuing the shift towards family preservation, the federal government should revise ASFA to complement FFPSA. As noted above, currently, ASFA simply adopts the problems of its predecessors and weakens the few protections that were in place for families prior to its passage.[394]

Going forward, "reasonable efforts" should be clearly defined in ASFA and should include a deeper analysis of factors that contribute to the harm of removal. The federal government may want to leave specific factors up to each state, but guidelines as to what constitutes reasonable efforts should be promulgated to avoid the confusion and ambiguity that currently exist. Clear federal guidelines will generate consistency across states that will trickle down to help create systematically equal treatment for all families.

Reasonable efforts should also be required in all cases. No family should be excepted from the reasonable efforts requirement. The current "aggravated circumstances" approach punishes children for their parents' actions without any specific consideration of the case at hand. A parent's prior acts regarding another child may certainly be evidence of their ability to parent the current child at issue, but a consideration of all the factors, including the harm of removal, should be required. The circumstances surrounding the previous act may no longer exist, and the parent's relationship with the child at issue may be very different. For example, a parent may have suffered drug addiction that led to termination of parental rights many years prior. Today, that parent could have been drug-free for a decade and have an excellent relationship with her child. That child, however, would not have the benefit of a consideration of the harm of removal or reasonable efforts under current law.

Federal leadership, guidance, and funding are critical to the proper functioning of the child welfare system in the states. Congress and the President should build on the FFPSA, revise ASFA, and clearly incorporate harm-of-removal principles into federal legislation, rulemaking, and appropriations.

### B. State Consideration of Harm of Removal

To prevent the harm of removal, state legislatures should add a required consideration of the harm of removal into their statutes that govern removal hearings in abuse and neglect cases. This will allow courts to balance the risk of harm to a child staying with their parents against the harm that removal would cause, which is rarely if ever considered now.[395] As discussed, Washington D.C. provides a model for legislation that lists factors to be considered.[396]

Additionally, state statutes could require consideration of enumerated factors, including: (i) whether a kinship resource is available to take the children; (ii) if a foster home been identified; (iii) where the identified foster home is in relation to

---

394. *See supra* text accompanying notes 284–309.
395. Novoa, *supra* note 174, at 32–33.
396. *See* discussion *supra* Section IV.D.1.

the child's home; (iv) whether the foster parent can accommodate the proposed visitation schedule; (v) if siblings will be placed together; (vi) if the child will have to transfer schools; (vii) whether the child's services or extra-curricular activities be disrupted; (viii) if the child has special needs and if so, whether the identified placement is able to accommodate those needs; and (ix) whether the child will be able to observe religious or cultural practices that are important to them in the identified placement. These considerations will mandate that courts grapple with the potential harm of removal.

A statute that simply codifies New York's caselaw could be equally effective. For example, such a statute could read:

> *In determining whether to remove a child, the court must first determine whether there is imminent risk to that child by remaining in their parent's care. If such risk is identified, the court must then determine if court orders against the parent or an order that the state agency must provide services to the family would mitigate the risk. If the court determines that the risk cannot be mitigated, it must then balance the risk against the harm that removal would cause before determining which course of action would be in the child's best interests.*

Each state should also clearly define "reasonable efforts" to incorporate consideration of the emotional and psychological harms of removal and list factors to be considered to address the specific harms identified.

States should also have clear criteria for determining whether the child protective agency made reasonable efforts. Each state should require that reasonable efforts consist of the agency seeking removal having to explain what they believe the impact of removal will be on the child and how they plan to mitigate the traumatic effects.[397] Early in a case, it may be challenging to accurately assess the traumatic effects that removal could have. Agencies already conduct investigations, however, and the agencies could tailor those investigations to elicit information regarding the harm of removal from parents and children. This information would assist a judge in making the determination of whether to remove a child and provide a plan for how that harm could be mitigated if removal is, in fact, necessary. If agencies require a helpful, partial list of emotional, psychological, physical, sexual, and other likely harms to investigate, this article provides one.[398]

To address the trauma of removal itself, before removal is completed, the state agency should also have to consider whether services could be put in place to avoid the need for removal. In many families, problems arise due to poverty or lack of access to mental-health or parenting-skills services. Too often, services are offered only after a child welfare case has been filed in court and removal is being

---

397. *Cf.* Liebmann, *supra* note 14, at 148.
398. *See supra* Part II.

contemplated. But many removals could be prevented if services were put in place as an initial matter.

The FFPSA seems to be a route to allow states to design and implement programs in high-need areas: mental health, drug addiction, and parenting skills.[399] Allowing for some of these services to be provided in-home also addresses some of the common failures of existing service plans, such that low-income parents will not have to worry about going to services that conflict with their work schedules, paying for transportation, or finding reliable childcare.[400]

In addition, child protective specialists could be required to explain the availability of public benefits and how to access them; provide the locations of food banks; and connect families to any available services that are not covered by the FFPSA. In determining whether reasonable efforts were made, judges should then be required to determine whether the services offered were necessary, practical, appropriate, and affordable. This will not be practical in all cases, as emergency removals are sometimes necessary. But, in many cases, the introduction of services may have an impact on the parents' ability to successfully meet their children's needs and may avoid the need for removal and the trauma that would flow therefrom.

If services are not sufficient, then the agency should consider whether the children could stay in their homes with more frequent visits from children's services agencies, or if a relative or friend who is approved by the relevant agency is able to move in with the family temporarily.

Finally, states should appoint lawyers for parents and children in all child welfare cases where the state is seeking a removal.[401] Lawyers for both parents and children would be able to advance arguments regarding all harms that a court should consider and provide information regarding the efforts the state made prior to removal. In New York, for example, where parents are assigned lawyers, many of whom are institutional providers who specialize in neglect and abuse proceedings, there are fewer removals and reunifications occur faster.[402]

---

399.  *See* Patrick McCarthy, *Family First Prevention Services Act Will Change the Lives of Children in Foster Care*, ANNIE E. CASEY FOUND.: BLOG (Feb. 12, 2018), http://www.aecf.org/blog/family-first-prevention-services-act-will-change-the-lives-of-children-in-f/ [https://perma.cc/8MGU-EJR7].

400.  *Cf.* Alana Semuels, *How Poor Single Moms Survive*, ATLANTIC (Dec. 1, 2015), https://www.theatlantic.com/business/archive/2015/12/how-poor-single-moms-survive/418158/ [https://perma.cc/N46V-LY85] (describing how women in one county lean on informal solutions to avoid the time-intensive "hassle" of redeeming benefits from an office).

401.  *See, e.g.*, Leonard Edwards, *Representation of Parents and Children in Abuse and Neglect Cases: The Importance of Early Appointment*, 63 JUV. & FAM. CT. J., Spring 2012, at 21.

402.  CTR. FOR FAMILY REPRESENTATION, THE CENTER FOR FAMILY REPRESENTATION 2014 REPORT TO THE COMMUNITY 1 (2014), https://www.cfrny.org/wp-content/uploads/2012/12/Annual-Report-2014-FINAL.pdf [https://perma.cc/8JDZ-JWUK]; Steve M. Wood & Jesse R. Russell, *Effects of Parental and Attorney Involvement on Reunification in Juvenile Dependency Cases*, 33 CHILD. & YOUTH SERVS. REV. 1730, 1739 (2011) ("The findings of the current study suggest that better outcomes (i.e., reunification) occur when parents, especially mothers, have legal representation, and when this legal representative is assigned early in the dependency proceedings and appears

These recommendations would allow for more exacting deliberations and more evenhanded results, as every court in the state would consider the same factors, and the information would be provided by lawyers with an understanding of the relevant statutory schemes.

Clearer guidelines would also assist states in ensuring that they receive the funding owed to them under the ASFA. To get this funding, they must prove that their agencies are making reasonable efforts to prevent removal and to reunify families. As discussed, most state statutes regarding reasonable efforts do not define that term, making it difficult for agencies and courts to determine whether this bar has been met.[403] More detailed statutes would guide agencies as well as courts by providing them with clear criteria that can be measured. Additionally, these statutory schemes would further the goals of the child welfare system and strike an appropriate balance between the right to family integrity and the state interest in protecting its children.

In sum, state lawmakers have myriad opportunities to clean up and buttress existing law to incorporate harm-of-removal analysis. This will make family preservation services easier for the state to provide given that federal funding will flow more easily and freely as a result.

### C. Judicial Decision-Making

Even if the statutes do not require a consideration of the harm of removal, courts have the power to interpret existing law to do so. Courts should follow the lead of New York's Appellate Division. As noted, New York's removal statute does not incorporate a consideration of the harm of removal.[404] That statute simply asks courts to consider, as many state statutes do, whether remaining in the home would be contrary to the child's best interests.[405] The New York Appellate Division, however, interpreted this language in the *Nicholson* case to require more than simply "identify[ing] the existence of a risk of serious harm."[406] Rather, "[i]t must balance that risk against the harm removal might bring, and it must determine factually which course is in the child's best interests."[407]

Every state statute has language that essentially requires a consideration of whether continuation in or removal from the home would be contrary to the welfare or best interests of the child.[408] Therefore, like New York, other state courts should interpret that language to require contemplation of the harms of removal.

---

in court at the time of the hearings.").

403.  *See supra* text accompanying notes 322–26.

404.  *See* discussion *supra* Section IV.D.2.

405.  N.Y. Fam. Ct. Act § 1027(b)(ii) (McKinney 2018).

406.  Nicholson v. Scoppetta, 820 N.E.2d 840, 852 (N.Y. 2004).

407.  *Id.*

408.  *See, e.g.*, Ala. Code § 12-15-306(a)(1) (2019); Ark. Code Ann. § 9-27-341(a)(3), (b)(3)(A), (b)(3)(B)(iii) (West 2019); Kan. Stat. Ann. § 38-2255(c)(1) (West 2019); Mass. Gen. Laws Ann. ch. 119, § 29C (West 2019); Okla. Stat. tit. 10A, § 1-1-102 (2019); Or. Rev. Stat. Ann. § 419B.337(1) (West 2019); S.D. Codified Laws § 26-8A-21 (2019).

This will allow the court to reach a fair result based on all the facts pertaining to a particular child and family, not just some.

Courts should also take seriously their role in determining whether an agency made reasonable efforts to prevent removal. Currently, challenging a finding of "reasonable efforts" is incredibly difficult, and the inquiry into whether or not the state agency made such efforts is not particularly rigorous.[409] Many courts simply have forms with a checkbox for whether reasonable efforts were made.[410] Scholars have noted that legislators were concerned that courts would be hesitant to deprive children of potential foster care funds, but summarily dismissed that concern due to their confidence in judges' ability to appropriately weigh their responsibilities.[411] Yet, in reality, judges rarely fail to make reasonable efforts findings.[412] One survey showed that less than four percent of judges had ever made a finding of no reasonable efforts.[413] Another showed that over 90 percent of surveyed judges rarely or never made a no-reasonable-efforts finding and over 40 percent had made reasonable efforts findings *even when they believed that the agency had not, in fact, made those efforts.*[414] Thus, the legal check on agency abuse is failing, and judges are the only ones with the power to correct this flaw in the system. They should wield that power going forward—aided by savvy practitioners, as outlined below.[415]

### D. Lawyers' Advocacy

Common law develops when courts adopt arguments made by creative lawyers. If the law in a particular jurisdiction does not incorporate the harm of removal, lawyers should argue it anyway. Attorneys may use *Nicholson v. Scoppetta* and Washington D.C.'s removal statute as non-binding but persuasive authority to encourage courts to consider harm of removal evidence.[416] Providing the court

---

409. *See* Kathleen S. Bean, *Reasonable Efforts: What State Courts Think*, 36 U. TOL. L. REV. 321, 324–29 (2005) (reviewing the history of state agencies' application of the federal "reasonable efforts" standard).

410. Shotton, *supra* note 325, at 227; *see also* Sankaran & Church, *supra* note 177, at 228 (pre-drafted reasonable efforts orders).

411. Sankaran & Church, *supra* note 177, at 226–27.

412. *Id.* at 227; *but cf.* Shotton, *supra* note 325, at 227 (lack of investigation into reasonable efforts could be due to confusion about whether the finding is even necessary to remove a child from a dangerous home).

413. Sankaran & Church, *supra* note 177, at 227 (citing Shotton, *supra* note 325, at 237).

414. CUTLER INST. FOR CHILD & FAMILY POLICY, MUSKIE SCH. OF PUB. SERV., & CTR. ON CHILDREN & THE LAW, AM. BAR ASS'N, MICHIGAN COURT IMPROVEMENT PROGRAM REASSESSMENT 105 (2005), https://muskie.usm.maine.edu/Publications/cf/MI_CourtImprovementProgram Reassessment.pdf [https://perma.cc/6ZG6-CDEG].

415. *See infra* Section V.D.

416. D.C. CODE ANN. § 4-1301.07 (West 2018); D.C. SUPER. CT. R. NEGLECT & ABUSE PROC. 13(e); Nicholson v. Scoppetta, 820 N.E.2d 840, 852 (N.Y. 2004); *see also* MARTIN GUGGENHEIM & VIVEK S. SANKARAN, REPRESENTING PARENTS IN CHILD WELFARE CASES: ADVICE AND GUIDANCE FOR FAMILY DEFENDERS 43 (2015) (suggesting defenders use *Nicholson* to emphasize the harms of removal to the court).

with a complete picture of the client and her family is a key part of a lawyer's responsibilities. A court cannot make a determination about a family without understanding it fully, and the lawyer's job is to draw that picture. Even if a court does not believe this information is relevant and is focused solely on risk to the child of remaining at home, as noted above, many state statutes leave room for these arguments.[417] For example, if the court must make a best-interests determination or decide whether leaving the child at home is contrary to the child's welfare, harm-of-removal arguments are relevant. Hence, lawyers should specifically articulate how the harm of removal is a necessary component for making this determination.

In addition to the harms described above,[418] lawyers could introduce information about:

> [C]hildren's attachments to their parents, the importance of parent/infant bonding, the children's special needs, that the children would be placed with strangers or in a congregate setting, that newborns would be unable to breastfeed, that siblings would be separated from each other, or any actual harm that has already befallen the children if they have already been placed in foster care and that is likely to continue if they are not returned home.[419]

As an attorney for a parent, this information allows the court to see the client as more than just the bad acts they have allegedly committed. Rather, it allows the court to see that person as a parent and to understand the client's relationship with his or her children.[420] It creates an opportunity to shape the narrative and fight back against the stereotype of the poor, neglectful parent, and to evaluate that person as an individual.

Making arguments about the harm of removal is also an extremely powerful tool for an attorney representing a child. Explaining to the court that a child does not want to be removed because of her attachment to her parents, her relationship with her teachers, and her ties to her community allows the court to see the full impact of removal, as opposed to an opportunity to punish a parent. An interview with a parent defense attorney in Baltimore revealed that harm-of-removal arguments are often successful when made by the child's attorney, even though Maryland's removal statute does not specifically contemplate the harm of removal.[421] However, until such consideration is mandatory, a judge is not required to even hear these arguments.

Lawyers should also engage experts to testify to the harm of removal. These experts should specialize in "attachment theory, developmental psychology, and

---

417. *See* discussion *supra* Section III.D.
418. *See* discussion *supra* Section II.
419. GUGGENHEIM & SANKARAN, *supra* note 416, at 43.
420. *Id.* at 26.
421. Interview with Vanita Taylor, Chief Att'y, Children in Need of Assistance Div., Md. Office of the Pub. Def. (University of Baltimore School of Law, Aug. 1, 2017).

typical measures of attachment."[422] If expert fees are prohibitive, attorneys at non-profits could consider involving a private firm as *pro bono* support. Firms seeking trial opportunities for associates (and public service credibility among their peers and recruits) may welcome the chance to retain and examine an expert in court. Some experts may also offer discounted rates to non-profit organizations or other attorneys who represent low-income clients.

Lawyers should not take for granted that the agency has made reasonable efforts. Advocates should make strong arguments for reasonable efforts to prevent removal and highlight services and solutions the agency could be putting into place to prevent removals. Lawyers should also ask for a finding of no reasonable efforts when such efforts are lacking.[423] Although judges are the system's check on the agency, lawyers should ensure that the judge has the necessary facts to be able to make such decisions effectively.

Additionally, although the law is supposed to presume that the interests of parents and their children are aligned until a finding of unfitness has been made,[424] courts presiding over abuse and neglect cases treat parents and children as adversaries, due to the suspicion placed on parents. As described by two parent defense attorneys and scholars, "Even before any finding of maltreatment has been made, . . . constitutional assumptions . . . are turned on their head, and the child's parents are no longer presumed to be able to speak for the child or, often, to provide any valuable information about her at all."[425] This is in direct contravention of the U.S. Supreme Court's mandate in *Santosky v Kramer*.[426] Lawyers should therefore advance these constitutional arguments to remind the court of its legal obligation to presume that parents act in the best interests of their children.

In short, lawyers can be the change they wish to see in the child welfare world. Marshaling legal arguments regarding a child's right to family integrity, as well as facts regarding the catastrophic and long-term harms that removal can impart, will encourage judges to push the common law in new and ultimately more child-protective directions.

## VI.
### CONCLUSION

The child welfare system exists to protect children from harm. Yet, in most jurisdictions in America, courts fail to consider the trauma that children will suffer if they are removed from their parents. This trauma is documented in study after

---

422.  Goldsmith, Oppenheim, & Wanlass, *supra* note 16, at 9.

423.  Jenny Pokempner, *Leveraging the FFPSA for Older Youth: Prevention Provisions*, AM. BAR ASS'N (Jan. 15, 2019), https://www.americanbar.org/groups/litigation/committees/childrens-rights/articles/2019/winter2019-leveraging-the-ffpsa-for-older-youth-prevention-provisions/ [https://perma.cc/6JB8-WAJW].

424.  Santosky v. Kramer, 455 U.S. 745, 760 (1982).

425.  Mulzer & Urs, *supra* note 311, at 35.

426.  *Santosky*, 455 U.S. at 760 ("[U]ntil the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship.").

study, yet remains virtually invisible in most family courts, as there is no legal requirement that judges take this information into account.

It is a sad reality that removing children may sometimes be necessary. However, in many cases, children can remain at home safely, particularly with targeted services or court supervision. Accordingly, considering the harm of removal in family court cases—whether by federal or state statutory mandate, or common law crafted by informed lawyers and judges—furthers the ultimate goal of the child welfare system: protecting children from harm.